[No. 8539.  *En Banc.*  March 24, 1910.]

H. M. FROST *et al., Respondents,* v. PUGET SOUND REALTY ASSOCIATES, *Appellant,* PARKE WEED WILLIS *et al., Interveners and Appellants.*[1]

CORPORATIONS — RECEIVERS—APPOINTMENT—GROUNDS—ACTS ULTRA VIRES.  The fact that a realty and investment company is acting *ultra vires* in violation of the trust company act is not ground for the appointment of a receiver at the suit of subscribers, since only the state can question the acts of the company on that ground.

SAME—EVIDENCE—SUFFICIENCY.  It is error to appoint a temporary receiver of a realty and investment company, at the suit of a few subscribers, where the evidence shows solvency, careful and capable business management and no probable loss to subscribers that can be avoided by a receivership.

SAME—REMEDY AT LAW.  The wrongful payment of commissions by a realty and investment company to one of its trustees is not ground for the appointment of a receiver, where the subscriber has a remedy at law without the aid of a receivership.

Appeal from an order of the superior court for King county, Gay, J., entered September 13, 1909, appointing receivers pending a suit for the dissolution of a corporation, after a hearing before the court.  Reversed.

*Shank & Smith* and *Hughes, McMicken, Dovell & Ramsey,* for appellant.

*Shepard & Flett,* for respondents.

*Harold Preston,* for interveners.

CROW, J.—Three separate actions, afterwards consolidated, were commenced by H. M. Frost and other investors, in the superior court of King county, to secure the appointment of a receiver for, and the dissolution of, the defendant corporation, Puget Sound Realty Associates.  Parke Weed Willis and two hundred and forty-one other investors, by complaint in intervention, joined the corporation in resist-

[1]Reported in 107 Pac. 1029.

ing the receivership. After issue joined, an order was entered appointing receivers *pendente lite*. From that order, which has been superseded, this appeal is prosecuted by the defendant corporation and the interveners, hereinafter designated as appellants and interveners.

The appellant Puget Sound Realty Associates is a corporation organized under the laws of this state, with $100,000 capital stock, all of which has been subscribed, and about $50,000 of which has been paid. The principal purpose of the corporation seems to have been to buy, sell, improve, rent, and generally deal in valuable real estate, primarily for the benefit of its investors or bondholders hereinafter mentioned, and thereafter for the joint benefit of the investors and itself. To obtain additional funds with which to carry out this enterprise, it issued income profit sharing bonds to its investors upon full payment; and also solicited subscription contracts for other like bonds payable in installments, the bonds to be delivered when the payments were completed. There were three series of bonds, which differed in some particulars not necessary to be now mentioned. The bonds of series 2 and 3 read as follows:

"No.——    Income Bond, Profit Sharing.    $——
"This is to certify that ———————— is the owner of this Income Bond, Profit Sharing, for ——— Dollars, issued by the Puget Sound Realty Associates, hereinafter called the Company.

"The Investment Fund of the Company is the net proceeds of all outstanding Bonds plus the net amount received on Contracts therefor and shall be invested in real estate and real estate securities in the State of Washington under the direction of the Board of Trustees of the Company.

"The net profits derived from the Investment Fund shall be divided in the following manner:

"First. Five per cent per annum on the face value of Bonds, and on the amount paid in on Contracts therefor, to the holders thereof, as a preferred dividend.

"Second. One-fifth of the net profits in excess of the said

five per cent per annum to a surplus fund, one-half to belong to the holders of Bonds, and the other one-half to the Company.

"Third.  One-half of the balance to the holders of Bonds as a special dividend and the other one-half to the Company.

"Fourth.  One-half of the net profits from the invested surplus fund to the holders of Bonds as a further special dividend and the other one-half to the Company.

"Those holding Contracts for Bonds shall participate only in the preferred dividend.  All dividends to be paid semi-annually on the first days of April and October of each year.

"The words 'net profits' as used herein shall be construed to mean the net profit realized from property in which the Investment Fund has been invested, including the rentals and the net profit realized whenever a sale is made.

"In calculating the net income and profits, only charges incident to the ownership and management of the properties in which the Investment Fund is invested shall be deducted from the gross income and profits.  Salaries of Officers and other office expenses of the Company shall not be deducted.

"This Bond is one of a Series designated as Series II, limited to $500,000.

"This Bond may be transferred by indorsement and record thereof on the books of the Company and proper acknowledgment hereon.

"The coupons attached hereto are for convenient receipting of dividends.

"Upon the final dissolution of the Company the Investment Fund and one-half of the Surplus Fund shall be returned to the bondholders out of the proceeds of the sale of properties in which said funds are invested.

"The books and records of the Investment Fund shall always be open to inspection by the holders of these Bonds.

"In Witness Whereof the Puget Sound Realty Associates has caused these presents to be signed by its President, or Vice President, and its corporate seal to be hereunto affixed and attested by its Secretary or Assistant Secretary, at Seattle, Washington, this ——— day of ———, 19———.  Puget Sound Realty Associates,

[Seal]                    By——————————, President.

"Attest: ——————————, Secretary."

To each bond coupons were attached reading as follows:

"Bond No.——                              Coupon No.——

"Amount of Bond $——                         Due ——, 19——.

"Puget Sound Realty Associates
"will make full payment to the owner and holder of this coupon out of the net profits mentioned in the bond to which this coupon is attached, at the office of the company in Seattle, Washington, the sum due for the income period in which this coupon is redeemable according to the terms named in the bond of which this coupon is a part.

"————————————————, President.

"————————————, Secretary."

The appellant secured subscribers for about $1,500,000 face value of these bonds, on which about $928,000 was collected. Of this sum it invested about $740,000 in real estate in the business districts of Seattle and Tacoma, much of which has since appreciated in value. Most of these properties were improved and produced rentals. All were subject to mortgage liens. Two were unimproved, but it was the intention of the appellant to erect business blocks thereon, and to satisfy the mortgages out of installments yet to mature on contracts for bonds subscribed. These installments were being regularly paid in large amounts during each month, until the fall of 1907. In addition to interest charges and general taxes, liabilities were incurred for heavy special improvement assessments, which latter, however, had been substantially discharged at the time of the commencement of this action. Some dividends had been made to the holders of the bonds, principally on those of series 1. In the fall of 1907 a financial panic occurred which caused many holders of installment contracts to default. Under these conditions appellant continued to handle the properties as well as it could, but was unable to declare any dividends or immediately discharge the mortgage liens. Some fifty investors, representing about $15,000 in bonds, being dissatisfied, commenced these consolidated actions to dissolve the corporation and secure the appointment of a receiver. Thereupon two hundred and

forty-two investors, representing over $200,000 in bonds, intervened for the purpose of resisting the receivership.

The trial court made findings which we cannot approve, as we conclude they are not sustained by the weight of the evidence. A detailed statement of the findings made or the evidence introduced would unnecessarily lengthen this opinion. The evidence, however, shows that, of the $928,000 collected from investors as payments on the $1,500,000 of bonds subscribed, about $188,000 was paid out as commissions to agents for securing the $1,500,000 of bond subscriptions, that a considerable portion thereof was primarily paid to one Duryea, one of the appellant's trustees, who had charge of all the soliciting agents, some three hundred or more in number; and that Duryea settled all traveling and other expenses incurred by himself and the solicitors. There is no evidence that any part of this sum was paid directly or indirectly to the appellant, or to any of its other trustees. The respondents contend that the payment of these commissions from the proceeds of the bonds was a misappropriation of funds; that the commissions were excessive, and that appellant had represented to its investors that no such payments would be made from the investment fund. There is no evidence that the amount of commissions paid was excessive for the services rendered, or that any such representations were made, other than to some two or three of the respondents whose evidence on that point is disputed, not only by other witnesses, but also by the surrounding circumstances. The interveners insist that the funds paid into the corporation by the investors had been properly handled and well invested; that the management of the properties acquired has been satisfactory to the interveners, and the investors generally; that the investments have been profitable; that greater profits will be yet realized out of them; that the deductions from funds paid as commissions in satisfaction of the cost of securing the funds was to be anticipated by the investors, and was expressly provided for in the bonds and

contracts; that the affairs of the investors have been honestly and economically administered by the corporation, and that the appointment of a receiver will be destructive of the enterprise and most prejudicial to the interests of all concerned. The appellant corporation contends that the following clause in the bond contemplated the payment of commissions:

"The Investment Fund of the Company is the *net* proceeds of all outstanding Bonds plus the net amount received on Contracts therefor and shall be invested in real estate and real estate securities in the State of Washington under the direction of the Board of Trustees of the Company."

The books containing appellant's accounts with the individual bondholders, which were at all times open to their inspection, plainly disclose these payments of commissions. While it is perhaps a fact that the payments were not publicly proclaimed, there is no evidence that they were at any time disputed or concealed. Moreover, they have been ratified by the interveners who hold more than $200,000 of the bonds, and no complaint appears as yet to have been made by any of the many other investors who have not appeared in this action. Assuming, without deciding, that some three or four of the respondents were misled or deceived in the matter of the commissions taken from their personal subscriptions, that fact would not necessitate the appointment of a receiver.

The main contentions of the respondents are, that the contracts between them and the appellant created a trust for which appellant is trustee, and of which they are beneficiaries; that the appellant is conducting a trust business in violation of chapter 176, Laws of 1903, page 367 (Rem. & Bal. Code, § 3346 *et seq.*), commonly known as the trust company act, under which it is not organized, and that its acts are *ultra vires*. Assuming, without deciding, that a trust has been created of which appellant is trustee, that it is violating the trust company act, and that its contracts are *ultra vires*, still the appointment of a receiver would not be authorized in this action. Not only have the respondents

subscribed for the bonds, but some twenty-seven hundred others have likewise subscribed, and have also invested their money in the common venture. They and the appellant corporation have thereby acquired valuable rights, and under such circumstances it would seem that the participating respondents should now be estopped from questioning the validity of their contractual relations with the appellant and the other investors. Whether or not the appellant is attempting to perform corporate acts in violation of the trust company act and without authority of law can only be questioned by the state in a proper proceeding instituted for that purpose.

The vital questions before us therefore are, whether the appellant is insolvent, whether the respondents are in imminent danger of sustaining losses which could be obviated through a receivership, and whether appellant has fraudulently or wilfully mismanaged its business affairs. The voluminous evidence, carefully considered, shows solvency, careful and capable business management under existing conditions, and no probable loss to respondents which can be avoided by a receivership. Only a small number of the investors ask or desire a receivership. The evidence indicates that the dissatisfaction of some of the investors has been engendered and intensified by the pernicious activity and animosity of a discharged employee who, since the panic of 1907, without apparent excuse, has endeavored to destroy their confidence in appellant, a proceeding that should receive no encouragement from a court of equity. On the other hand, the interveners, who represent over $200,000 par value of these bonds, earnestly desire that the appellant may continue in charge, insisting that less expense will be thereby incurred, and that the investors' interests will be thus best subserved. This fact, while not controlling, should be taken into consideration in connection with other questions discussed, in passing upon the application for a receiver. All other investors have remained inactive, or have at least re-

frained from joining in this consolidated action. Considering this attitude of the bondholders, the fact that the present but temporary difficulties of this corporation have been caused largely by the panic of 1907, aided by the activities of a discharged employee, the further fact that the evidence shows the appellant corporation is doing all in its power to conserve and protect the interests of the investors, and that it is not insolvent, it would seem that no greater hardship could be imposed upon investors, bondholders or stockholders than a receivership.

The judgment is reversed, and the cause remanded with instructions to vacate the order appointing the receivers.

Parker, Mount, and Gose, JJ., concur.

Dunbar and Fullerton, JJ., concur in the result.

Rudkin, C. J., and Chadwick, J. (concurring)—Conceding, but not deciding, that the company wrongfully paid commissions out of the subscribers' money, it does not appear that any other wrong was done the bondholders. For this the subscriber would have his remedy at law and, if so entitled, could recover without the aid of a receivership. Receivers of going concerns should not be appointed at the instance of a minority of stock or bondholders, unless it clearly appears that the rights of all parties will be best served by such procedure. High, Receivers (3d ed.), § 295a.

Courts should not assume the management of private enterprises in the absence of a wilful attempt on the part of the trustees to defeat the objects of the venture, or such gross incompetence in management as would imply a fraudulent intent to dissipate the corporate property. The tendency to appoint receivers at the instance of those who have, for the hope of greater gain, put their money to speculative uses should be checked rather than encouraged.

We concur in the result.