[No. 25202.   Department Two.   March 7, 1935.]

KRISTINE THOMLE *et al., Respondents and Cross-appellants,* v. SOUNDVIEW PULP COMPANY *et al., Appellants,* WALTON N. MOORE *et al., Defendants,* JULIA D. LUNDIN *et al., Interveners.*[1]

[1]Reported in 42 P. (2d) 19.

*Kerr, McCord & Carey* and *Black & Rucker,* for appellants.

*Ryan, Askren & Ryan* and *W. H. Abel (T. H. McKay* and *Karl R. Bendetson,* of counsel), for respondents and cross-appellants.

*Lundin, Barto & Devin,* for interveners.

*Newton & Newton* and *O. B. Thorgrimson, amici curiae.*

STEINERT, J.—Plaintiffs commenced this action as stockholders of Soundview Pulp Company to enjoin the consolidation and merger of that company with two other corporations. By an amended complaint, it was sought not only to enjoin the proposed consolidation and merger, but also to have the organization of Soundview Pulp Company adjudged fraudulent, illegal and void, to have the assets which were being held by that company restored to a syndicate of which plaintiffs were members, to have a trustee appointed to take charge of such assets, to secure the return of certain properties alleged to have been dissipated by

the manager of the syndicate, and to obtain a full disclosure and accounting of the acts and doings of the manager. Other persons intervened in the capacity of stockholders, and sought the same relief as that demanded by plaintiffs in their original complaint.

Trial before the court resulted in a decree enjoining the consolidation and merger, declaring the assets of the corporation to be held in trust for the benefit of its stockholders and the unit-holders of the syndicate, appointing a trustee to take charge of the corporate assets for a limited purpose and period, and retaining jurisdiction of the cause with the view of controlling the ultimate liquidation and distribution of the assets, but denying all other relief prayed for.

Soundview Pulp Company and certain of its officers and trustees appealed from the affirmative provisions of the decree, and gave a supersedeas bond in accordance with an order of the court, which stayed the enforcement of the decree in all respects save as to the provisions relative to consolidation and merger. Plaintiffs, as respondents, cross-appealed because of the court's refusal to appoint a receiver and to require the reconveyance of certain properties.

This controversy affects not only financial investments totaling over four million dollars, but also the very life and welfare of a large industry employing many hundreds of people. The record is voluminous; the details are extensive and ramifying. A clear understanding of the case will necessitate a rather extended statement of the facts. Condensing them as much as an intelligible conception of the case will permit, they are as follows:

Pierce, Fair & Company, a California corporation, underwrote a seven-hundred-thousand dollar bond issue for Clear Lake Lumber Company for the construction of a sawmill at Clear Lake, Washington. The

bonds were secured by a mortgage covering the mill and also the capital stock of Puget Sound Cascade Railway Company and certain timber in the Mt. Baker district. Due to default in the third interest coupons and the pressure of the current creditors of the lumber company, Pierce, Fair & Company concluded that quick and decisive action was necessary in order to protect the outstanding bonds. It accordingly bought back the bonds from the investors, reimbursing the holders for the full amounts paid by them. It then foreclosed the mortgage and became the owner of the properties covered thereby. The sawmill then remained idle for about a year, during which time Pierce, Fair & Company advanced approximately three hundred thousand dollars to preserve the property.

Up to this point, the facts narrated have no material bearing on the issues. They are offered simply as a perspective to what follows.

At, and prior to, the time that Pierce, Fair & Company came into ownership of the Clear Lake Lumber Company properties, Mr. Ossian Anderson and a group of his associates were the owners of Fidalgo Pulp & Paper Co., San Juan Pulp & Paper Co., and an option on the Hartford & Eastern Railroad. Mr. Anderson proposed to Mr. Fair, of Pierce, Fair & Company, that these properties be merged with the Clear Lake Lumber Co. properties owned by Pierce, Fair & Company, and that a new corporation known as Puget Sound Pulp & Timber Company be organized. The proposal was ultimately accepted, and the new corporation was formed. Pierce, Fair & Company took approximately one-third of the capital stock of the new corporation for the properties that it had turned in. During the next three years, Pierce, Fair & Company paid in approximately a million dollars more for additional stock in the corporation.

The negotiations leading up to the merger contemplated the construction at Everett of a one-hundred-fifty ton, high-grade bleached sulphite pulp mill, at an estimated cost of three and a half million dollars. The capital for the new project was to be recruited through a syndicate, which investors having substantial sums of money would be invited to join. The proposed method of financing was adopted and followed.

Up to this point, the facts are still introductory, and of themselves present no ground of controversy.

We have now arrived at the point where the transactions affect the respondents. The time is laid as of August 1, 1929. On that date, Pierce, Fair & Company, in San Francisco, California, prepared a written document termed "Puget Sound Pulp & Timber Co. Syndicate Agreement," and circulated copies thereof among prospective investors. Inasmuch as this instrument lies at the foundation of the present controversy, it merits specific attention and analysis.

By way of introduction, it recited that a syndicate was being formed for the purpose of purchasing $4,500,000 of First Mortgage & Collateral Trust Convertible 6% Gold Bonds, together with forty-five hundred shares of preferred stock and forty-five hundred shares of common stock, both without nominal or par value, of Puget Sound Pulp & Timber Co., for the aggregate price of $4,185,000; that the interests in the syndicate would consist of 4,185 units of the principal amount of $1,000 each. It appears that the nine thousand shares of capital stock were donated to the syndicate by Pierce, Fair & Company. Hence, it would follow from the figures above that the bonds were being purchased by the syndicate as a whole at ninety-three. Pierce, Fair & Company was not to receive any profit to itself from the sale of the bonds.

Proceeding from this introductory recital, the syn-

dicate agreement contained eleven numbered paragraphs setting forth and explaining in detail, and in language that was clear and easily understandable, the terms and conditions of the agreement, as follows: (1) Pierce, Fair & Company was to be the manager of the syndicate; (2) no interest in the syndicate was to be transferable, except by way of pledge, without the written consent of the manager; (3) the purpose of the syndicate was to acquire the above-described bonds and stock of Puget Sound Pulp & Timber Co., and to sell or otherwise dispose of all or any part of such securities; (4) upon payment of the price of the units, receipts were to be issued to the purchasers. The members of the syndicate were not to be partners with or for one another, nor with or for the manager; (5) the syndicate was to expire August 15, 1933, unless the manager should, in its discretion, extend the term for a period of not to exceed four years. Within thirty days after the termination of the syndicate, the manager was to make final distribution of the net assets and profits; (6) this paragraph, quoted, in part, verbatim, is as follows:

''The Manager shall have entire control of the business and affairs of the Syndicate and may conduct the same in such manner as it deems advisable. The Members irrevocably grant to the Manager full power and authority, for account of the Syndicate, to do any and all acts and enter into and execute any and all agreements or other instruments necessary, proper or expedient, in the judgment of the Manager, to carry out and perform this Agreement, including the right to sell at public or private sale from time to time, in the discretion of the Manager, any and all of the securities owned by the Syndicate, or to exchange any of such securities for other securities, and generally, as such Manager, to transact the business of the Syndicate in such manner as in its discretion it may deem for the best interests

of the Syndicate. The Manager may have transferred on the books of the Corporation [Puget Sound Pulp & Timber Co.] to its individual name, or the names of any other persons selected by it, any and all stock owned by the Syndicate . . . The Manager shall have full power to vote as the holder of such stock, or to cause the holder of any such stock, held for the account of the Syndicate, to vote for the sale by the Corporation of any or all of its properties, or for the consolidation of the Corporation with any other corporation, or for the reorganization or dissolution of the Corporation, the determination of any such matters being left to the sole judgment and discretion of the Manager. . . . The Manager shall have the right, in its own name or otherwise, but for the account of the Syndicate, to do all such things and take all such action as may be necessary in its discretion to sell, merge or consolidate the properties of the Corporation with those of any other person, firm or corporation, or to reorganize, recapitalize or refinance the Corporation, and for such purpose the Manager shall have the right to exchange any or all securities owned by the Syndicate for securities of any other corporation into which it may be merged or consolidated or to which its properties may be sold, or for the securities of a reorganized or recapitalized corporation. The Manager may transact, in its own name or in any other, all business of the syndicate with third persons. The enumeration of particular or specific powers in this agreement shall not be construed to limit the general power and discretion to be conferred upon and reserved to the Manager in order to fully authorize it to do any and all things in its discretion deemed by it proper, necessary or expedient to carry out the purposes of this agreement, it being the intention hereof that the powers of the Manager expressed herein are to be given the most liberal construction.''

(7) The manager was to have authority to employ depositaries, legal counsel, agents and other assistants, and was to be reimbursed by the syndicate and its members for all commissions, taxes, counsel fees or other

expenses incurred by it; (8) the proceeds of the securities acquired by the syndicate, whether from dividends, sale or otherwise, were to be distributed by the manager (a) to the payment of expenses, (b) to the payment to the members of an amount equal to interest at the rate of six per cent per annum upon their respective investments, (c) to the payment to the members of the principal of their investment, and (d) the balance, if any, to be distributed, seventy-five per cent to the members and twenty-five per cent to the manager; (9) for purposes of distribution, the manager was authorized to fix a valuation on the securities, the same to be final and conclusive; any apportionment or determination by the manager of any profits or losses were, likewise, to be final and conclusive. The manager was in no event to be held liable to the members for any matter except for the want of good faith or for wilful misconduct; (10) all moneys, securities or other property of the syndicate were to be deposited with Bank of California, N. A., as depositary, but without limiting the power of the manager to sell or otherwise dispose of the same, or to invest them in such manner as it might determine; and (11) the agreement, so far as each member was concerned, was to be in counterpart, one part when signed was to be returned to the manager and the other part retained by the member. All of the counterparts when returned were to be taken together as constituting the syndicate agreement.

Respondents in due time became members of the syndicate, Thomle purchasing one unit, Heiberg two units, and Altenburg one unit. There were, all told, 4,185 units held by 746 different individuals.

The $4,185,000 produced by the formation of the syndicate and the sale of the units was advanced to Puget Sound Pulp & Timber Co. as the construction of the

Everett mill progressed, and, in the meantime, the unused portions of the funds were loaned on call, thereby bringing an additional increment to that company.

Unfortunately for everyone connected with this case and contrary to all expectations, the operations of the Everett mill have not been a financial success. The zodiac of its existence has not been auspicious. It appears to have been born at the autumnal equinox, and to have moved rapidly to the winter solstice. No sooner had it manifested an infant virility before it became enveloped in the tentacles of the "great depression of 1929," that Sea of Sargasso into which many an industrial craft has drifted and become stranded.

We need not depict the contributing influences in detail. It is sufficient to say generally that an utterly demoralized pulp market and the strictures occasioned through lack of operating capital ultimately produced a situation varying between gloom and desperation. These conditions, operating directly upon the affairs of Puget Sound Pulp & Timber Co., produced a spinal reflex upon the affairs of the syndicate. Susceptive danger to the business of the company meant jeopardy to the bonds held by the syndicate. The situation demanded extreme care, and upon the manager of the syndicate, on whom full power had been conferred by its members, lay the legal and moral duty of protecting the interests of the unit-holders to the extent of its best judgment and ability.

In 1930, the company had sustained a net loss of $46,000. On August 15, 1931, it paid only one-half of the interest on the bonds, and gave the syndicate manager its unsecured note for $67,500 for the other one-half. In 1931, the company lost $418,000, inclusive of interest obligations and depreciation, and ceased its

lumber operations at Clear Lake. It defaulted in its bond interest due February 15, 1932. The members of the syndicate were notified of these facts, and of the further fact that it would undoubtedly be necessary for both bondholders and stockholders to make sacrifices.

Shortly after February, 1932, Pierce, Fair & Company, the syndicate manager, called together a group of seven of the major participants in the syndicate, representing $390,000 of the total investment, to act as an advisory committee under the existing emergency. The committee engaged itself in an endeavor to forestall possible disaster with some businesslike solution, and finally formulated and proposed a plan of reorganization whereby all the assets of Puget Sound Pulp & Timber Co. would be transferred to a new company. Under this plan, the syndicate was to surrender the bonds and stock of the old company and take in exchange therefor the total issue of stock of the new company's class A preferred stock.

The members of the syndicate were notified of the details of the plan by letters dated April 10, 1932, calling a meeting of the members on May 10, 1932, for the consideration of the plan, and enclosing therewith a written form of approval. Over thirty-six hundred units favored the plan, and there was no negative vote nor any objection thereto. It will be observed that this plan contemplated the exchange of bonds for *stock*. Reinforced with this expression of sentiment, the syndicate manager endeavored to carry out the plan of reorganization, but owing to increasing losses of the company and the attitude of common creditors, its efforts were unsuccessful, and the plan had to be abandoned.

Continuing its efforts to effect a satisfactory solution of the difficulty and with the aid and approval of the advisory committee, the syndicate manager then

evolved what is herein termed a "partitioning plan." Under this plan, the properties of Puget Sound Pulp & Timber Co. were to be segregated into two divisions, northern and southern, and conveyances were to be made to the syndicate, or its nominee, of the properties in the southern division, comprising the Everett plant, the Hartford & Eastern Railroad with the timber contiguous thereto, and the Mitchell Bay Limerock Quarry, with all taxes and insurance on the properties paid, and the payment of the $67,500 note above mentioned guaranteed, together with other items. The syndicate, in turn, was to surrender the bonds theretofore held by it.

By letters dated June 18, 1932, the manager notified the members of the syndicate of the details of this plan, and also of the fact that Pierce, Fair & Company was then donating and transferring to the syndicate all of the stock held by the latter company in Puget Sound Pulp & Timber Co., being 36,050 shares of common stock and 36,050 shares of preferred stock. A ballot by which the members of the syndicate might register their approval was enclosed with the letter. A favorable response from 3,262 units out of a total of 4,185 units was received. There was no dissenting vote cast, nor was any objection made. The partitioning plan was accordingly consummated in all its details, and the properties in the southern division were conveyed to Soundview Pulp Company. Thereafter, thirty additional units registered approval of the plan.

It was at this point that appellant Soundview Pulp Company came into existence, as a part of the adoption of the partitioning plan. On July 15, 1932, its articles of incorporation were filed. It had common stock, divided into 4,185 shares, each being of the par value of ten dollars, so that each share had a representative value equivalent to each syndicate unit. The entire

issue was subscribed for and taken by Pierce, Fair & Company as manager of the syndicate. The corporation was authorized to do a general business, and particularly to own, hold, lease and operate pulp mills, sawmills, railroads and logging operations, and to sell its assets for stock in other corporations when deemed expedient by its trustees and authorized by a two-thirds vote or consent of its stockholders.

Pursuant to the partitioning plan, the southern properties, above referred to, were conveyed to Soundview Pulp Company, and the $4,500,000 trust mortgage was in turn released. The Soundview Pulp Company then leased the Everett mill to Puget Sound Pulp & Timber Co., the lease being terminable on three months' notice. These facts were communicated to the members of the syndicate by its manager in a letter dated August 18, 1932. Pursuant to the terms of the partitioning plan, the manager collected the $67,500 unsecured note of Puget Sound Pulp & Timber Co.

At this time, it is well to observe that, prior to the partitioning plan, the syndicate owned and held (a) $4,500,000 of Puget Sound Pulp & Timber Co.'s bonds, (b) 4,150 shares of its common stock, (c) 4,150 shares of its preferred stock, and (d) the company's unsecured note for $67,500; and that, after the consummation of the partitioning plan, the syndicate became the owner of and held (a) all of the stock of Soundview Pulp Company, (b) twenty-five per cent of the stock of Puget Sound Pulp & Timber Co., and (c) the proceeds of the $67,500 note.

Between June 18, 1932, and March 10, 1933, the depression had grown progressively worse, and the affairs of Puget Sound Pulp & Timber Co. were causing the manager of the syndicate and the advisory committee increasing alarm. As already stated, the mill at Everett was being operated by Puget Sound

Pulp & Timber Co. under an indefinite lease from Soundview Pulp Company. There was strong likelihood, however, that, at any time, the mill would have to be taken back and operated by Soundview Pulp Company or the syndicate. It was, therefore, necessary to safeguard jealously any cash on hand belonging to the syndicate, for use in that eventuality. With the view of securing as much ready cash as possible, the syndicate, acting through its manager, sold its stock holdings in Puget Sound Pulp & Timber Co. for $40,-550, thus giving it a total cash reserve of about one hundred thousand dollars.

In March, 1933, Mr. Ossian Anderson, of the Puget Sound Pulp & Timber Co., sought to buy from the syndicate the southern properties, including the Everett mill, for $1,400,000 cash. It will be noted that this amount was considerably less than what had been originally invested in the mill alone; and that, had it been accepted, the syndicate members would have received only about thirty cents per dollar of their original investment. The offer and its consideration by the syndicate manager indicate the terrific shrinkage and loss that had taken place in the capital investment. Mr. Anderson tried over a period of four months to raise the money by loan from the Reconstruction Finance Corporation or elsewhere, but was unsuccessful, and hence, nothing came of the offer.

In the meantime, the Big Four Inn property, which was controlled by Hartford & Eastern Railroad, and on which the latter paid the United States government an annual ground rental, had been a further source of worry and expense, and without any revenue, to the syndicate. The manager of the syndicate and the advisory committee decided to abandon that property. The appellant Dickey offered to pay the rental charges, the insurance and watchman charges, and, if he could

sell the property for a sum in excess of what he had expended, to return the difference to the company. The syndicate manager having decided to abandon the property, Mr. Dickey was given a bill of sale thereof by the railroad company. Although Mr. Dickey has paid out about two thousand dollars on the property, he has never been able to make any sale of it.

During this same period, the railroad company itself had steadily lost money, its operations were unprofitable, and a considerable expenditure for repairs was in the offing. The railroad company being without credit, application was made to the Interstate Commerce Commission for leave to abandon operation. Subsequently, the railroad was abandoned, so far as operation was concerned.

This brings us down to about July 12, 1933. The affairs and conditions of the Everett mill, which was still being operated by Puget Sound Pulp & Timber Co. under the lease, had not improved. Uncertainty, disappointment, discontent and gloom had approached the point of despair and desperation. The only thing left, so far as the reasonably immediate future was concerned, was the possibility that market prices on pulp might rise in the fall of 1933, concerning which there was some prospect.

About this time, there came from without a suggestion and proposal, which, in the judgment of the manager and the advisory committee, was the best and only solution of the whole problem. The endeavor to effect the terms of that proposal precipitated the present action, and although that endeavor in itself is no longer important here, as we shall presently see, it nevertheless gave rise to such violent opposition on the part of a few of the syndicate members as to convert the whole matter from expedient administration into convulsive litigation.

Mr. E. M. Mills, president of Rainier Pulp & Paper Co., located at Shelton, and also president of Olympic Forest Products Co., located at Port Angeles, both of which corporations owned and operated pulp mills similar to the Everett mill, proposed to the syndicate manager that the three corporations be consolidated and merged. Briefly and in general, the plan proposed involved the formation of a merger company, with an authorized capital stock of seven hundred and fifty thousand shares. The three merging corporations were to turn in all their assets, with some reservations on the part of the Rainier and the Olympic companies, and in exchange to receive stock in the new company according to the value of their assets and in the following amounts: To Rainier Pulp & Paper Co., 200,000 shares; to Soundview Pulp Company, 171,585 shares; and to Olympic Forest Products Co., 125,000 shares. The liabilities of each of the companies were to be assumed by the new company, and in turn the Rainier and Olympic companies were each to loan to the new company substantial portions of their net working capital reserved from the merger.

Following a number of conferences by the representatives of the three corporations, the proposal and a tentative acceptance were put into final form. Contemporaneously with the progress of the proposed plan, the syndicate manager decided to terminate the syndicate, under the terms of the syndicate agreement. Accordingly, on July 12, 1933, Pierce, Fair & Company, the manager, notified the syndicate members by letter that the syndicate would be terminated on July 31, 1933, and that Pierce, Fair & Company would, as a corporation, dissolve. The letter further advised the members that the manager would turn over to Soundview Pulp Company the funds held by it, approximat-

ing ninety thousand dollars; and that the outstanding 4,185 shares of common stock of that company, held by the syndicate, would be transferred and delivered to Bank of California, N. A., the depositary of the syndicate units, to be in turn delivered by the bank to the various syndicate members upon their surrender of their unit deposit certificates or receipts.

A confirmatory letter dated September 15, 1933, followed, accompanying which was a notice to the syndicate members that a special meeting of stockholders of Soundview Pulp Company would be held October 3, 1933, for the purpose of ratifying the plan. The meeting was held, 2,712 shares being represented in person or by proxy. None of the respondents were present or represented at the meeting. All acts respecting the proposed consolidation and merger were unanimously approved. Thereafter, the trustees of Soundview Pulp Company held a number of meetings, at which various steps were taken to perfect the merger.

Finally, on December 5, 1933, a stockholders' meeting was held pursuant to call and notice thereof. At that meeting, the holders of 3,068 shares of stock and units together, out of a total of 4,185 shares and units, were represented in person or by proxy. After a full discussion of all the details affecting the proposed merger, a vote was taken; and of the 3,068 shares and units represented, 3,057 voted to approve the merger and eleven voted against it.

At this point, it may be well to consider the alignment of the respective unit holders. At the time of the meeting of December 5, 1933, the holders of 2,633 units, out of a total of 4,185, had exchanged their units for stock. Between that time and February 27, 1934, 698 additional units were likewise exchanged for stock. Of the remaining 854 units, the holders of 419 sent in

their proxies to be voted at the meeting in favor of the merger. This makes a total of 3,780 favorable units. Four hundred and twelve units were not represented at the meeting at all, nor did their holders register any protest. This leaves twenty-three units. Of these, the interveners herein, holding six units, were opposed to the merger, but in their brief they ask that the present action be dismissed. Their position, legally speaking, accords with the conclusions expressed herein. A holder of three units was opposed to the consolidation, and at the trial appeared as a witness for respondents, but did not become a party to the action. A holder of ten units, who had not taken stock in exchange, but who participated at several stockholders' meetings, also appeared as a witness for respondents, but did not intervene.

This leaves only the respondents, who together held four units, for which stock had not been taken in exchange. Respondents Heiberg and Altenburg, holding three units, did not vote at the stockholders' meeting, nor did they register any protest or objection. It now appears that, at the time that the amended complaint was filed, on which this action was tried, Altenburg was dead, and no substitution of parties was ever made. It further appears that respondent Heiberg has, since the appeal was taken, transferred his two units to one Fred Shaneman, who has appeared separately by his attorney and now aligns himself with the appellants. The tabulation thus reduces itself to one unit, held by respondent Thomle. Although she has never exchanged her unit for stock, she nevertheless appeared, through her brother as proxy, at the stockholders' meeting of December 5, 1933, and protested against the consolidation. This action was instituted December 9, 1933, four days after the last

stockholders' meeting. This completes our statement of the case.

The complaint, and the amended complaint to an even greater extent, charged the manager of the syndicate and the defendants named in the pleadings with fraud, connivance, conspiracy and mismanagement, having for their object the dissipation of the syndicate assets and "to freeze out and deprive these plaintiffs and minority stockholders of their property without due process of law." Meeting these charges, the trial court stated in its memorandum opinion: "I find that the syndicate manager acted for what it deemed the best interests of the unit holders." Paragraph I of the decree reads as follows:

"That in the management of the affairs of the Puget Sound Pulp & Timber Company Syndicate, Pierce, Fair & Co., as syndicate manager, were not guilty of any fraud or intentional wrong-doing; and in the management of the affairs of said Soundview Pulp Company, a Washington corporation, the trustees, officers and managing agents thereof have not been guilty of any fraud or intentional wrong-doing. Said corporation is not insolvent."

It was evidently the trial court's theory, as disclosed in the decree, that the proposed merger was

". . . illegal and not in the best interests of said Soundview Pulp Company, a corporation, or of the persons or parties beneficially interested in the property and assets held by the corporation,"

and that such assets should therefore be taken over and held by a trustee for the benefit of the stockholders of the corporation and the remaining unit-holders of the syndicate, although the court had previously expressed the view that it had a horror of receiverships or anything that savored of a receivership, a view in which counsel concurred.

With reference to the charges of fraud, we will say,

after a considerate reading of the record, that, in our opinion, the charges were wholly groundless; and that, to the contrary, the syndicate manager, the advisory committee, and the officers and trustees of Soundview Pulp Company, evidenced a meticulous concern for the interests of the syndicate members and a remarkable degree of patience and effort in trying to work out the best solution of a most difficult and discouraging problem. We therefore consider this case wholly apart from any charge or suggestion of fraud.

Appellants' assignments of error may be grouped under three heads: (1) Error in permitting the amended complaint to be filed and proceeding to trial upon the issues presented thereby; (2) error in enjoining the proposed consolidation and merger; and (3) error in decreeing that Soundview Pulp Company held its assets in trust for certificate unit-holders, and in appointing a trustee to take possession of the pulp mill, with the possibility of proceeding to liquidation. Respondents' assignments of error upon their cross-appeal are directed, generally, (1) to the refusal of the court to require a reconveyance of the Big Four Inn property by appellant Dickey; and (2) to the refusal of the court to appoint a receiver to wind up the affairs of the syndicate and to liquidate its assets.

We take up first appellants' assignments of error.

In view of our conclusion upon the merits of the case, the first group of assignments becomes immaterial.

The second group presents what is now but a moot question, although at the time of the trial it was the moving and principal question in the case. It has already been stated that the court in its decree enjoined the proposed consolidation and merger of the three corporations, and that, to that extent, the decree was not permitted to be superseded. Hence, the merger, which was set for a specific time now long past,

has been effectually jettisoned. But above and beyond that, by subsequent record made in this court, it definitely and decisively appears that, because of, and subsequent to, the decree herein, Rainier Pulp & Paper Co. and Olympic Forest Products Co. have elected to withdraw, and have withdrawn, from any further consideration of consolidation and merger with Soundview Pulp Company, and the briefs of counsel proceed upon the theory that such is the indisputable fact. The matter of consolidation and merger is therefore eliminated from further consideration.

We have, then, only the third group of assignments. These relate to the status of the assets now held by Soundview Pulp Company. Stated definitively, the question is whether, under the terms of the syndicate agreement and the acts of the manager, the syndicate members are now the owners in common of the physical assets included in the southern division of properties and now standing in the name of Soundview Pulp Company, or whether they merely own the stock of that company.

It is contended by respondents that the syndicate here involved is a common law trust, and should be dealt with as such. This, however, presents no problem for adjudication here, because no attack has been made upon the syndicate as an entity. The position of the respondents is, and must be, grounded upon the existence and validity of the syndicate agreement. In any event, only the state could complain of the exercise by the syndicate of powers contrary to the laws of this state. *Haynes v. Central Business Property Co.,* 140 Wash. 596, 249 Pac. 1057.

The discussion by counsel of the nature and effect of the syndicate agreement and the status of the syndicate's assets takes a wide and divergent range. There seems to be no point or place at which the opposing

sides come to intimate grips. We have spent much time in following their various leads concerning the creation, conduct and termination of the trust. The briefs contain considerable argument concerning the rules relating to principal and agent, express trusts, resulting trusts, and trusts *ex maleficio*.

As may be expected, business trusts, commonly referred to as ''Massachusetts trusts,'' come in for much dissertation. We shall not tempt counsel by any dogmatic statement concerning the genus or nature of business trusts, nor attempt to classify them as belonging within the category of corporations, or partnerships, or of pure trusts. All will admit that they are *sui generis*. Whatever they are, they have been a prolific source of both discussion and litigation. In some states, they have flourished under a favorable jurisprudence. In others, they have withered or become abortive by reason of the interceptive effect of revenue and regulatory statutes. In this state, they have received, at most, but doubtful welcome. To the many texts and cases upon the subject may be added the following interesting and instructive monographs and comments by students of the subject: 21 Yale Law Journal 311; 37 Yale Law Journal 1103; 23 Columbia Law Review 423; and 29 Michigan Law Review 1053.

So far as this case is concerned, however, it presents, in our opinion, simply a question of contract augmented by a question of agency, to be determined by the rules pertaining to those subjects.

The intention of the parties to a contract, when clearly expressed in the instrument, must govern. *Loutzenhizer v. Peck*, 89 Wash. 435, 154 Pac. 814; *Brunswick-Balke-Collender Co. v. Seattle Brewing & Malting Co.*, 98 Wash. 12, 167 Pac. 58. Where the contract is unambiguous, the intention of the parties must be derived from such construction as can reasonably

be given to the language used and to all the circumstances surrounding the transaction, including the situation of the parties, the subject matter, and the subsequent acts of the parties under it. *Northwestern Lumber Co. v. Bloom,* 135 Wash. 195, 237 Pac. 295; *Burkheimer v. Seattle,* 162 Wash. 645, 299 Pac. 381.

Viewing the syndicate arrangement as an agreement, rather than as a juridical entity, we have this situation: The syndicate members, including the respondents, entered into a contract with *each other,* as well as with the syndicate manager, by the terms of which specified sums of money were pooled to be invested by the manager, with the hope and expectation of ultimate profit. Deliberately, the parties thereto adopted a plan or arrangement which was considered the best means for effectuating their intention and object.

The manager was given broad and almost unlimited powers, with the added provision that such powers were to be accorded the most liberal construction. The manager was to have entire control of the business and affairs of the syndicate, with the unqualified authority to enter into any and all agreements deemed by it expedient to carry out its terms; to sell or exchange any of its securities; to vote the stock held by it, whether for the sale of the properties of Puget Sound Pulp & Timber Co., or for the consolidation of that corporation or its properties with any other corporation or its properties, or for its reorganization or dissolution; and to exchange the securities owned by the syndicate for the securities of any other corporation. The only limitation placed upon the syndicate manager was the exercise of good faith and the absence of wilful misconduct.

Undoubtedly these powers thus granted were sweeping in their significance and effect, but each of the syn-

dicate members entered into the agreement fully apprised of its legal consequence. Each had the right to refrain from entering into the agreement, but he also had the right, if he did enter into it, to expect and demand that all the others would likewise be bound thereby. Each, therefore, bound himself to a correlative duty. As the case now stands, all those who have manifested any interest in the matter whatever, except, at most, two respondents, holding two units, have indicated their intention and desire to stand by the contract and to accept the results of the manager's discretion and acts.

The respondents alone, or rather one of them holding one unit, would now have a receiver appointed, with all the risk incident to such proceeding. The very theory upon which that respondent proceeds runs counter to her conception of the agreement. According to her contention, the individual members of the syndicate, and not the Soundview Pulp Company, became the owners in common of the assets of the latter company at the time that the partitioning plan was effected. If that were true, then, to the extent that such owners permitted that corporation to conduct the business and affairs of the syndicate, they would have assumed liability for the acts of such corporation, a result which no doubt they would be the first to disclaim, resting their disclaimer on the provisions of the instrument which prescribed that no member was to be a partner with or agent for any other member, or with or for the manager.

Upon the contractual phase of the matter, we are convinced, and hold, that the syndicate agreement was plenary and controlling upon the syndicate members.

Proceeding now to the agency phase of the matter, we shall focus our attention upon the point immediately and most seriously in issue; that is, whether

the manager had the right to convert the units into stock. It must be remembered, as both sides seem to concede, that the syndicate members were not to be considered as agents for each other, or for the manager, but that the manager was the agent of the syndicate members. Again, we note that the authority conferred by the members of the syndicate upon the manager was fully and unambiguously declared in the agreement.

The interpretation of authorization is governed by the general principles of interpretation relating to contract. Restatement of the Law of Agency, § 32. Hence, if the authority is expressly conferred, the express provisions control. If the express provisions of the contract be broadened by the peculiarly enveloping circumstances of the case, then the authorization must be interpreted in the light of all the accompanying circumstances, including, among others: (a) The situation of the parties, their relations to one another, and the business in which they are engaged; (b) the general usages of business, the usages of trade, and employment of the kind to which the authorization relates; (c) facts of which the agent has notice respecting the objects which the principal desires to accomplish; (d) the nature of the subject matter, the conditions under which the act is to be performed, and the legality or illegality of the act. Restatement of the Law of Agency, § 34.

Whether we view the matter solely from the express provisions of the contract or whether we consider, in connection therewith, all the attendant circumstances, we have no hesitancy in declaring not only that the discretion of the manager in respect of the exchange was legally and soundly exercised, but that common sense, fair dealing among all the members of the syndicate, their inseparable connection with each other,

and the anomalous situation that would be presented if 4,185 units, represented by 746 individuals, content and malcontent, were put in charge of an industry having the proportions of the one here involved, warranted, and from every practical and logical standpoint necessitated, the metamorphosis of syndicate units into stock certificates. We hold that the syndicate manager had the authority to make the exchange, and that its discretion was soundly and properly exercised in making the transfer.

We now take up respondents' assignments of error. The refusal of the court to compel a reconveyance of the Big Four Inn from Mr. Dickey, we think, was fully justified. The record shows that the property was not only an empty bag, but a bag with a hole in it. The inn meant nothing as an asset; its proportions were large as a liability. Though in form the transaction by which the inn was disposed of was by bill of sale, it was in fact an abandonment of the property. We agree with the trial court that the manager exercised a wise and sound discretion in getting rid of it.

As to the matter of a receivership, what we have already said seems to us to be a sufficient answer to respondents' contention. We need only to add a brief reference to a case arising upon a somewhat similar state of facts and decided by this court many years ago. *Frost v. Puget Sound Realty Associates,* 57 Wash. 629, 107 Pac. 1029. In that case, the corporation floated a series of income profit-sharing bonds, the proceeds of which were to be invested in business properties to the extent of seven hundred and forty thousand dollars. Due to the panic of 1907, the company met with serious losses, and consequently, was unable to pay dividends. Some fifty investors, representing about fifteen thousand dollars in bonds, began

an action to secure the appointment of a receiver. Thereupon, two hundred and forty-two investors, representing over two hundred thousand dollars in bonds, intervened for the purpose of resisting such appointment. In reversing the trial court, this court held that, assuming that a trust had been created of which the corporation was a trustee, still the appointment of a receiver would not be authorized, under the existing facts. The court said:

"Not only have the respondents subscribed for the bonds, but some twenty-seven hundred others have likewise subscribed, and have also invested their money in the common venture. They and the appellant corporation have thereby acquired valuable rights, and under such circumstances it would seem that the participating respondents should now be estopped from questioning the validity of their contractual relations . . ."

And further:

"Only a small number of the investors ask or desire a receivership. . . . On the other hand, the interveners, who represent over $200,000 par value of these bonds, earnestly desire that the appellant may continue in charge, insisting that less expense will be thereby incurred, and that the investors' interests will be thus best subserved. This fact, while not controlling, should be taken into consideration in connection with other questions discussed, in passing upon the application for a receiver. All other investors have remained inactive, or have at least refrained from joining in this consolidated action. Considering this attitude of the bondholders, the fact that the present but temporary difficulties of this corporation have been caused largely by the panic of 1907, aided by the activities of a discharged employee, the further fact that the evidence shows the appellant corporation is doing all in its power to conserve and protect the interests of the investors, and that it is not insolvent, it would seem that no greater hardship could be imposed upon in-

vestors, bondholders or stockholders than a receivership.''

This same language, both in premise and in conclusion, might well be written of the case before us.

Reversed, with instructions to dismiss the action.

BEALS, MITCHELL, HOLCOMB, and BLAKE, JJ., concur.