[No. 29099. Department One. December 9, 1943.]

PERRY J. CHAFFEE, *Respondent*, v. STEPHEN E. CHAFFEE, *Appellant*, C. A. NEVILLE *et al., Defendants.*[1]

[1]Reported in 145 P. (2d) 244.

*Stephen E. Chaffee,* for appellant.

*J. P. Tonkoff,* for respondent.

STEINERT, J.—Plaintiff brought suit upon two causes of action set forth in his complaint. In the first of these causes, he sought to recover from one of the defendants, Stephen E. Chaffee, the sum of $750 for work and labor alleged to have been performed by the plaintiff for that defendant. In his second cause of action, he sought to compel, as against the defendants Stephen E. Chaffee and Milton Lewis, (1) conveyance to himself of a ninety-five acre ranch situated near Granger, in Yakima county; (2) cancellation of a quitclaim deed which, it was alleged, plaintiff had been induced through misrepresentations to execute, thereby

relinquishing his interest in the ranch to the defendant Lewis who later conveyed the property to the defendant Chaffee; and (3), in effect, cancellation of a written agreement made between the plaintiff and the defendant Chaffee at the time of the execution of the foregoing quitclaim deed. Plaintiff also sought, in his second cause of action, as against the defendant Stephen E. Chaffee and the defendants C. A. Neville, Loren L. Taylor, Harry Knudsen, and Ted Lehr, an accounting of all moneys and profits alleged to have been received by the entire group of defendants in a turkey growing business conducted upon the ranch, with which venture all the parties to this suit were in one way or another connected.

The defendant Lewis defaulted in the action. The other defendants, appearing in two groups, but through the same counsel, answered, setting up general denials and also affirmative defenses involving cross-complaints against the plaintiff for breaches of certain contracts pertaining to the turkey growing venture.

Upon a trial without a jury, the court entered a decree (1) adjudging the defendant Stephen E. Chaffee to be the owner and entitled to the possession of the real estate comprising the ranch above mentioned, and quieting his title thereto as against any and all claims of the plaintiff; but (2) granting plaintiff judgment against defendant Stephen E. Chaffee alone in the sum of $13,255.96, together with interest thereon at the rate of six per cent per annum from January 1, 1942; and (3) adjudging plaintiff to be the owner and entitled to the possession of certain specified personal property used, and still in use, as equipment in connection with the operation of the ranch and turkey growing enterprise.

Defendant Stephen E. Chaffee gave notice of appeal from that portion of the decree which was adverse to him, and in due time superseded the judgment by depositing with the clerk of the superior court cash in the sum of fifteen thousand dollars, in lieu of a supersedeas and cost bond. The plaintiff did not appeal from any portion of the decree.

We shall hereinafter refer to Stephen E. Chaffee as the appellant, to Perry J. Chaffee as the respondent, and to the other parties above mentioned as defendants.

The first matter to be disposed of is respondent's motion, made in this court, for an order dismissing the appeal upon the grounds (1) that the statement of facts proposed by appellant and certified by the trial court is inadequate, and (2) that a number of the exhibits which were made a part of the statement of facts as certified are missing from the record. We shall consider the two grounds in the order stated.

This was an equitable action, presenting multifarious issues of fact and of law, and involving a long and intricate accounting. The trial lasted a period of approximately three months, during the progress of which the trial judge wrote six successive memorandum opinions. Although admittedly all of the testimony given by the various witnesses is not before us, the statement of facts certified by the trial court covers two thousand pages. Respondent asserts that this comprised only about one-third of the testimony. Five hundred ten written exhibits were introduced in the course of the trial.

In preparation of his appeal, the appellant followed the procedure prescribed by Rule IX(2), Rules of the Supreme Court, 193 Wash. 10-a, by serving and filing "a concise statement of the points on which he intends to rely on the appeal," together with a proposed statement of facts covering so much of the evidence as in appellant's opinion bore upon the questions sought to be reviewed. Respondent proposed no amendments, and the trial court, after due consideration, certified the statement of facts as proposed, in compliance with the rules set forth in *Livermore v. Northwest Airlines, Inc.,* 6 Wn. (2d) 1, 106 P. (2d) 578.

The certificate of the trial court is in proper form, and there is nothing in the record which in any way indicates that the court erred in its consideration and certification of the contents of the statement of facts as proposed. Under such circumstances, augmented by the fact that respondent

proposed no amendments, we are foreclosed from further inquiry as to the sufficiency of the statement of facts as certified. *von Herberg v. von Herberg,* 6 Wn. (2d) 100, 106 P. (2d) 737.

■ The second ground of the motion is that fifty-five of the entire number of exhibits introduced are not included in the statement of facts, and, in particular, that nine of these exhibits, though originally by reference made a part of the statement, are now missing. The certificate of the trial judge recites that the exhibits as therein listed are all the exhibits introduced and received in evidence in connection with the testimony and proceedings contained in the statement of facts. The respondent made no request for the inclusion of other exhibits. For reasons similar to those hereinbefore given in disposing of the first ground of the motion, we are precluded from inquiring into the relevancy, materiality, or necessity of any exhibit other than those which were certified by the trial court.

■ Respondent's statement that "nine" of the exhibits as certified are still missing from the record is not entirely correct. We have carefully checked the record on appeal and find that but *five* exhibits are missing, namely, numbers 19, 317, 361, 412J, and 419. The absence of even five authenticated exhibits, however, presents a situation that requires attention, since it is the duty of the appellant in a case on appeal to see that a proper statement of facts and such exhibits as have been made a part thereof are filed in this court.

An affidavit made by a deputy clerk of the superior court for Yakima county states that, after the exhibits in the case had been introduced, appellant himself had on various and numerous occasions taken fifty-five of them out of the clerk's office for different periods of time and had not returned them. If this be true, it indicates a practice that should not be permitted nor condoned, for reasons that are obvious. Were it clear to us now that the five exhibits are material to the consideration of the issue upon which this opinion is based, or were there even any serious ques-

tion on that score, we would be fully warranted in striking the entire statement of facts as certified, letting the consequences fall upon the party at fault.

■ In this instance, however, the character of the missing exhibits is clearly identified in the statement of facts. In the aggregate, they comprise the postmark upon a postal card, a number of checks the amounts of which are otherwise shown, and a bundle of invoices and charge slips considered by the trial court upon the accounting phase of the action. Our disposition of the case upon its merits, however, is in no way dependent upon an examination of these exhibits nor upon the mathematical results of the accounting as determined by the trial court. For these reasons, the absence of the five exhibits does not warrant us in striking the statement of facts. The motion to dismiss the appeal is therefore denied.

We come now to the merits of the case, necessitating a presentation of the facts as disclosed by the evidence as certified. We may say at the outset that the various memorandum opinions and supplemental comments of the trial court, comprising one hundred thirty-eight pages, have been found most helpful as a digest of the evidence, and we shall avail ourselves of much of the material contained therein.

Appellant and respondent are brothers. Appellant is the older of the two, but respondent is a mature man, of the age of approximately fifty years. Appellant is an able, experienced, and outstandingly busy member of the legal profession, residing in Sunnyside, Washington. At the same time, he has devoted much of his attention to various interests outside the practice of law. For many years he has dealt in real estate and other property, for himself as well as for his clients. He has owned, and now owns, several farm properties, aside from the one involved in this litigation. He has acted in a trust capacity in both public and private matters.

Respondent, though in all respects an intelligent person, is an uneducated man. Until some time in 1935, he had

spent the greater part of his life in the state of New York, where he was engaged in general labor, farming, and, to some extent, in turkey raising.

During the spring of 1935, appellant went east on business and while there visited his brother in New York. Apparently there had been no close contact between the two brothers for many years. In time past, respondent had acquired some property through inheritance or otherwise, but had lost most of it. At the time of appellant's visit, respondent was in poor financial circumstances and was anxious to change his location and get a new start. Appellant told him of the opportunities to be had in the west.

After appellant's return home, there was some correspondence between the brothers, as a result of which respondent came to Sunnyside, Washington, in June, 1935. With the assistance of appellant, respondent obtained employment, doing manual labor at a mine near Kellogg, Idaho. Appellant held considerable stock in the corporation owning the mine. The mining venture proved unsuccessful, however, and respondent was unable to collect his wages. Appellant sent him money from time to time for board and other expenses.

In September, 1935, respondent returned to Sunnyside and for several months thereafter lived at appellant's home. During that same period he did work of various kinds for appellant, chiefly repair and construction work upon properties owned by the latter, who in turn furnished respondent board, room, and expense money. Respondent's first cause of action is based on the services rendered by him during the period between September, 1935, and the early part of April, 1936.

Throughout this interval the brothers frequently discussed the matter of getting the respondent started in some kind of business with which he was familiar through former experience. During the winter of 1935-1936 they reached an understanding to the effect that respondent would engage in the business of growing and selling turkeys and marketing turkey eggs; that appellant would finance him for an indefinite period of time; and that from

the proceeds of the operations respondent would repay appellant all moneys advanced by him. It is clear, however, that neither of the brothers then foresaw the magnitude to which such operations would, and eventually did, extend nor the complications that would ultimately arise.

About the first of April, 1936, the turkey enterprise was commenced. Appellant furnished to respondent a ranch of about fifty or sixty acres, known as the "Stover Road ranch," and advanced moneys with which to buy lumber and other material for the construction of brooder houses, and to purchase equipment, eggs, poults, feed, and other items. By the end of that year, respondent was indebted to appellant, as found by the trial court, in the sum of $6,156.04.

In the early part of January, 1937, respondent moved onto another ranch, designated in the record as the "Mabton ranch," which likewise had been procured by appellant. Operations continued there in much the same manner as before, with the result that at the end of that year respondent was indebted to appellant in the sum of $6,310.42.

In December, 1937, respondent, having lost a number of turkeys through a disease known as "blackhead," desired to get upon clean land with alfalfa growing thereon for pasture. Appellant took respondent to view a tract of land containing about ninety-five acres located near Granger and known as the "Turkey Range ranch." An arrangement was effected by which respondent moved upon that ranch early in 1938, and since that time all operations involved in this action have been conducted there.

One of the issues in this case, as presented by the pleadings and the evidence, concerns the method of acquisition and the present ownership of the Turkey Range ranch. Respondent's evidence was to the effect that appellant had represented to him that the land could be purchased from the Sunnyside irrigation project for $2,200, which was but a fraction of what it was worth; that appellant agreed to advance the necessary purchase price, with the understanding that respondent would repay that amount out of

the operations of the business and thus become the owner of the land; and that in January, 1941, respondent did actually pay appellant the sum of $2,100 to be applied on that particular account. Appellant's evidence was to the effect that in August, 1937, he himself had purchased the land at a price of $2,000, under an executory contract in which the name of the defendant Milton Lewis was inserted as the purchaser; that in January, 1941, appellant paid the purchase price in full and a deed was taken in the name of Lewis; that on February 14, 1942, Lewis executed a deed conveying title to the property to appellant; that respondent was fully advised, before going onto the premises, that the land belonged to appellant; and that respondent moved thereon with the understanding that he was merely to have the use of the premises for the purposes of the turkey enterprise.

The operations on the Turkey Range ranch continued, with expanding proportions, through the years 1938, 1939, and 1940. Thousands of dollars worth of turkey eggs, selling at a price ranging from eighteen to twenty-two cents each, were marketed through a Colorado organization known as "Mile High Poultry Farms." Eggs and turkeys were also marketed through the Washington Co-Operative Egg & Poultry Association. However, at the end of 1938, respondent was indebted to appellant in the sum of $7,-556.15; at the end of 1939, in the sum of $5,863.02; and at the end of 1940, in the sum of $6,974.31. In the meantime, appellant had also become interested in other turkey ventures.

During the fall of 1940, appellant expressed alarm concerning the operations and the large indebtedness claimed to be owing to him, and insisted that respondent make some arrangement for partial payment. Respondent at that time owned $800 worth of capital stock of the Washington Co-Operative Egg & Poultry Association, having acquired the stock in connection with the sale of products through that organization. He thereupon sold the stock and paid the proceeds to appellant. Later, at the insistence of appellant that the indebtedness be further reduced, respondent bor-

rowed $5,000 from a bank on his promissory note which appellant endorsed. From the proceeds of the loan, respondent paid appellant $2,100. There is a dispute between the parties as to whether that sum was to be applied on the indebtedness to appellant or on the purchase price of the ranch.

About this same time, appellant insisted upon a change in the method of operation of the turkey enterprise and called respondent's attention to the difficulty of securing adequate help on a wage basis. Appellant expressed his belief that more satisfactory results could be obtained under a system by which tenants would operate the farm on a "share the crop" basis. Pursuant to that suggestion, and with the acquiescence of respondent, appellant procured two tenants, defendants Neville and Taylor, and later two others, defendants Knudsen and Lehr, who went upon the ranch in 1941, under written contracts in which both respondent and appellant were designated as first parties and the respective groups of tenants as second parties. These contracts are too lengthy to be set forth in their entirety and we shall give only a general summary of their contents.

By the terms of these contracts, respondent and appellant, as first parties, leased the land to the tenants, as second parties, for indefinite periods. They also agreed therein to furnish to the tenants all necessary seed grain and alfalfa seed, a team of horses and certain farm equipment, and from three thousand to four thousand poults each year. Appellant individually further agreed in the contracts to advance all groceries, meats, and supplies required by the tenants, and respondent at the same time individually agreed to pay for one-third thereof and to board with one of the tenants. The four tenants, in turn, agreed to do all the labor in connection with the operations; to construct or repair all flumes; to keep all equipment and brooder houses in good condition; and to pay a certain portion of the cost of binding grain, of feed, gas, oil, and electricity. Finally, it was agreed that, after the turkeys were grown and sold, the proceeds therefrom, after certain deductions and reim-

bursements to the first parties, should be equally divided among the parties to the respective contracts. It appears that, in the early part of 1941, appellant had taken over the management of a part of the turkey enterprise, and respondent continued with the management of the remainder.

The numerous complications which subsequently arose out of the operations under these contracts present much of the dispute involved in this action, but these need not be recited here. Suffice it to say that by August, 1941, not only had much friction developed between respondent and the tenants, but also, as stated by the trial court, the brothers themselves "seemed to have grown sour on each other." Respondent became suspicious that his brother, the appellant, was not dealing in absolute good faith with him, and this feeling led to a demand by respondent for a statement of his account and to the execution of another contract which later caused a total breach between the brothers. That contract presents the principal issue involved in this action.

Appellant prepared an account as demanded and at the same time drew up a proposed form of contract for execution by the two brothers. On the evening of August 13, 1941, respondent went to appellant's office where a discussion lasting about two hours took place. Appellant stated to respondent that the account showed an indebtedness owing by respondent in an amount of about $7,500. The proposed contract was then read, discussed, and signed by both parties. Because of its importance in the decision of this case, the contract will be quoted in full, as follows:

"This agreement, made and entered into this 13th day of August 1941, by and between Perry J. Chaffee [respondent], party of the first part and Stephen E. Chaffee [appellant], party of the second part, Witnesseth;

"WHEREAS, the second party did advance and loan to first party monies with which to engage in and continue to operate the turkey business for a period of about five years, commencing about January 1st 1936, and ending January 1st 1941; and,

"WHEREAS, the first party became heavily indebted to the second party and the first party was unable to pay said indebtedness; and

"WHEREAS, the second party in order to protect said investment, did about January 1st 1941, take over the management of the turkey business, with the exception of the laying hens and the hatching and battery brooding of poults, and operated the same with tenants on shares; and,

"WHEREAS, the second party is the owner of the land on which the turkey business has been carried on; and

"WHEREAS, THE PARTIES HERETO, wish to definitely define the rights and interests of each party in and to the property used in connection with said turkey business, and the management of said business,

"Now THEREFORE, in consideration of the premises it is mutually understood and agreed by and between the parties hereto as follows, to-wit;

"1. The second party at the request of first party has prepared and submitted a statement showing monies advanced and repaid, which statement both parties hereto shall check and make such additions thereto and deductions therefrom as may be necessary showing the true state of the account between the parties. Interest shall be computed on monies loaned at the rate of 8% per annum and a reasonable and fair charge shall be made as rental for the use of land occupied by the first party in connection with said venture and a reasonable amount shall be allowed to second party for his services in connection therewith, particularly in connection with the operation and management of said business since the first of January 1941.

"2. First party does hereby convey full and complete title to all property used in connection with said turkey business to the second party, and second party shall hold full and complete title thereto until all sums heretofore advanced and which the second party may hereafter advance together with other items herein mentioned have been fully paid and satisfied. During said period the second party shall have full and complete management of said turkey business.

"3. During said period the first party shall cooperate fully with the second party and with the tenants now on or hereafter placed on said premises and shall devote his time and attention in connection with said business and in the performing of such work as the second party shall

direct under the general direction and management of the second party.

"4. All monies received by the second party in connection with said business, over and above such sums as may be necessary in the operation thereof, shall be applied by the second party in payment of the sums now due and owing by the first party to the second party as herein provided, provided however, the second party shall advance money for the current expenses of the first party.

"5. The title to the real estate is now and shall remain in the second party and he shall be entitled to retain out of the monies received a reasonable rental for the use thereof.

"6. In the event the first party shall comply with the terms and agreements herein contained, then and in that event, when all sums due and owing the second party have been fully repaid, as herein provided, then and in that event, each party hereto shall thereafter have an undivided one half interest in said turkey business, but not in the ranch on which the same is operated, which is not included, but the management thereof, save and except to the extent that second party shall permit first party to operate the same shall be in the second party. A reasonable and fair rental shall be paid to the second party for the land. Balance of monies received above disbursements shall be divided equally between the parties hereto, share and share alike.

"7. In the event the first party shall continue working in connection with said turkey business until the first of January 1942, but shall decide on or before that time that he would prefer to operate separately, and to turn over all assets in payment and satisfaction of all sums due and owing to the second party, then upon the first party relinquishing all interest, the second party will furnish the first party 2500 poults with which to get a start in the turkey growing business.

"8. In the event the first party shall fail or refuse to comply with the agreements herein contained, he shall forfeit all interest in said enterprise of every name and nature.

"9. This agreement shall supersede all previous agreements between the parties hereto. As soon as parties can reach an agreement as to the amount of indebtedness due and owing by the first party to the second party the first party shall execute his note therefor.

"In Witness Whereof, the parties hereto have set their hands in duplicate the day and year first above written.
"PERRY J. CHAFFEE
"STEPHEN E. CHAFFEE."

At that same meeting, respondent also executed a quitclaim deed, covering the land comprised in the Turkey Range ranch. The deed ran to the defendant Milton Lewis, who at that time held the title to the property, but, as previously indicated by appellant's evidence, the land had been actually purchased several years before by appellant himself under an executory contract which named Lewis as the purchasing party. According to the testimony of appellant, the quitclaim deed from respondent was taken in order to clear the title to the land against a cloud existing thereon by reason of a recorded agreement which respondent had executed some years before with reference to the use of a well located on adjoining property. Respondent's evidence regarding the deed was that he had been induced to sign it through misrepresentations.

On the day following the foregoing transaction, respondent repented of his act. He testified: "The next day I changed my mind about it." Approximately a month later he consulted his present counsel, who on November 21, 1941, commenced this action. In the meantime, appellant had taken complete charge of the enterprise under the terms of the contract, and concededly has operated it ever since through the tenants above named. Since August 13, 1941, when the agreement was executed, or at least since about the middle of September, 1941, when respondent consulted counsel, he has in no way participated in the operation of the ranch or the enterprise conducted thereon.

After this action had been commenced, the parties sought to effect a compromise. A stipulation was entered into by counsel authorizing the employment of an accountant to prepare a statement of the respective claims of the parties, upon which they might further negotiate for settlement or else have the court determine the disputed questions. An account was prepared, but instead of leading to a settlement it threw the whole matter into further

complication, to such an extent that the trial court ultimately disregarded the stipulation and all steps previously taken with reference thereto.

Although this presentation of the facts in the case has been quite lengthy, it does not purport to cover in detail the multitudinous issues. It would be impossible to make an accurate statement of the countless matters in dispute unless we should resort to a narrative hundreds of pages in length. Even that, however, would produce more of confusion than of enlightenment, for the case as a whole and in all of its ramifications is a glaring example of how business ought not to be transacted, whether between members of a family or between strangers to the blood. We have endeavored, therefore, to give only a general outline of the case, preparatory to a consideration of the controlling questions as we view them.

 The first three days of the trial were devoted to the introduction of evidence upon the question of title to, and ownership of, the ninety-five acre ranch upon which the enterprise has been conducted since January, 1938. After the evidence upon that question had been completed, and upon the request of counsel, who desired a preliminary ruling upon that issue, the court recessed, while counsel wrote voluminous briefs upon the subject. After due consideration, the trial court delivered its first memorandum opinion, discussing the evidence introduced up to that point, announcing the principles of law applicable thereto, and concluding that the legal title to the land, and the equitable ownership thereof, were in the appellant. The final decree adjudged the appellant to be the owner of the real property, free from any claim of the respondent. Although respondent now argues that the trial court was in error in that adjudication, he took no appeal from the decree. We therefore will spend no further time upon that question, but will proceed, as did the trial court, upon the theory that appellant is the owner, and entitled to the possession, of the real estate here involved.

At this point, we may also say that, with the exception of one or two small items, the trial court allowed respondent nothing upon his first cause of action, in which respondent had sought to recover for work and labor performed prior to the initiation of the turkey enterprise. Since respondent took no appeal from that ruling, it likewise requires no further consideration.

After the trial court had decided the question of the ownership of the land, the remainder of the trial, lasting nearly three months, was spent in taking evidence upon the subject of an accounting between the parties. The process was tortuous and difficult. No books of account had been kept, and the various items of receipts and expenses were supplied by checks, charge slips, and invoices procured from the business concerns with which the parties had dealt in previous years. All moneys received from the enterprise had been deposited by appellant in his personal bank account where he also kept the funds of his law business and the moneys collected for his clients. Matters were made progressively more complicated by reason of the arrangements between the principal parties and the two sets of tenants above mentioned. Altogether, the situation presented to the trial court was exceedingly difficult. Not only was there a violent conflict upon nearly every question of fact, but seemingly the parties were unable to agree upon the principles of law affecting their determination.

The theory upon which the case was finally decided can best be stated by quoting from the trial court's fifth, and decisive, memorandum opinion:

"The court was at a loss at the start of this trial to know upon what theory to treat the relationship existing between the parties. We were constrained at first to apply the partnership theory, or at least that of a joint adventure, but the vehement protests of both parties led to a different conclusion. Neither wished to have the case decided on any theory of either partnership or joint adventure, and inasmuch as the rights of no third parties were involved, the court acquiesced in the desire of the parties.

"The action was therefore treated as one for simple accounting, with the added feature involved by the fact that the defendant took over the management of the property in 1941 under the contract of August 13, Exhibit 9.

"The court was in doubt as to the validity of the contract of August 13, 1941, Exhibit 9, due to the lack of any consideration for the same. The accounts as set up at that period were in such state that it seemed to be apparent that no indebtedness was owing by the plaintiff [respondent] to the defendant [appellant]; but later these accounts were corrected, and there is now no doubt in the mind of the court that a very substantial sum was due from the plaintiff to the defendant on August 13, 1941. [What that amount was, however, does not appear from any statement made by the court.] Therefore, the court concludes that the instrument in question was a valid agreement between the two parties.

"The only question, therefore, is as to the construction of that instrument. The court believes, and has acted under the theory, that the instrument as between the parties is in the nature of a chattel mortgage, resulting in the defendant assuming control and charge of all the property as a mortgagee in possession."

Upon that theory, the trial court proceeded with an accounting of all transactions from the beginning of the enterprise in 1936 down through 1942. In doing so, however, the court adopted the date of December 31, 1941, as marking a division of relationships existing between the parties before and after that date. That decision was reached upon an assumptive theory that on or about January 1, 1942, appellant had converted the property to his own use, thereby terminating the relationship created and existing under the terms of the contract of August 13, 1941. Proceeding upon that basis, the court determined (1) the state of the account with reference solely to operations of the enterprise down to January 1, 1942, including rental allowances to appellant for the use of the real estate, and (2) the amount of the inventory of property then on hand "converted" by appellant, increased or diminished by certain other items which the court also took into consideration. The results of the computation were as follows:

| | | |
|---|---|---|
| Debit. against respondent at end of 1940........... | $6,974.31 | |
| Debit for interest owing to appellant............ | 37.50 | |
| Debit for services to appellant as manager....... | 1,366.50 | |
| | | |
| Credit to respondent for operations 1941-42...... | | $ 4,184.78 |
| Credit Inventory December 31, 1941............. | | 14,880.00 |
| Credit for value of improvements.............. | | 150.00 |
| Credit rent on personal property.............. | | 500.00 |
| | $8,378.31 | $19,714.78 |
| | | 8,378.31 |
| Amount owing to respondent....................... | | $11,336.47 |

Upon further consideration by the trial court, this total amount was increased by $1,919.49, and judgment was entered against appellant in the sum of $13,255.96.

The inventory amounting to $14,880, as determined by the trial court, and for which the appellant was charged, was calculated as follows:

| | |
|---|---|
| For breeder turkeys at $8.00 each........................ | $ 7,380.00 |
| For commercial birds .................................. | 6,000.00 |
| For feed, potatoes, and miscellaneous items.............. | 1,500.00 |
| | $14,880.00 |

The commercial birds were inventoried on the basis of their. actual meat value. The breeders were inventoried according to their *potential* value, and, solely for the purpose of arriving at such potential value, the court took into consideration the eggs and poults derived from the breeder turkeys during 1942, as shown by the accounting.

The vital question presented upon this appeal is whether the trial court committed error in proceeding as it did in determining the amount alleged to be owing by the appellant to the respondent.

As stated before, the trial court had previously held that the contract made between appellant and respondent, on August 13, 1941, was a valid agreement and partook of the nature of a chattel mortgage. It will also be recalled that the agreement provided that the operations of the turkey enterprise should continue as before, except that appellant should thereafter have complete management thereof, and

that all moneys received by appellant, over and above such sums as were necessary in the operation of the enterprise, should be applied first to the payment of the amount due and owing by respondent to appellant, and the balance divided equally between the two brothers.

The effect of the trial court's decision was to write an entirely new contract for the parties. It not only terminated respondent's interest in the enterprise, but it also compelled appellant (1) to accept turkeys and other items of property in payment of the indebtedness owing to him by respondent, and (2) to purchase and pay for, in money, respondent's entire interest in the business.

■ It is elementary law, universally accepted, that the courts do not have the power, under the guise of interpretation, to rewrite contracts which the parties have deliberately made for themselves. The expressions of the various courts on the subject are tersely stated in 12 Am. Jur. 749, Contracts, § 228, as follows:

"Interpretation of an agreement does not include its modification or the creation of a new or different one. A court is not at liberty to revise an agreement while professing to construe it. Nor does it have the right to make a contract for the parties—that is, a contract different from that actually entered into by them. Neither abstract justice nor the rule of liberal construction justifies the creation of a contract for the parties which they did not make themselves or the imposition upon one party to a contract of an obligation not assumed. Courts cannot make for the parties better agreements than they themselves have been satisfied to make or rewrite contracts because they operate harshly or inequitably as to one of the parties. If the parties to a contract adopt a provision which contravenes no principle of public policy and contains no element of ambiguity, the courts have no right, by a process of interpretation, to relieve one of them from disadvantageous terms which he has actually made."

See, also, 17 C.J.S. 702, Contracts, § 296.

This court has frequently made similar statements of the law. In *Collins v. Northwest Cas. Co.,* 180 Wash. 347, 39 P. (2d) 986, 97 A.L.R. 1235, we said:

"We are not permitted, upon general considerations of abstract justice, or in the application of the rule of liberal construction, to make a contract for the parties that they did not make themselves, or to impose upon one party to a contract an obligation not assumed."

To the same effect, see *Hays v. Bashor,* 108 Wash. 491, 185 Pac. 814; *Johnson v. McGilchrist,* 174 Wash. 178, 24 P. (2d) 607; *Thomle v. Soundview Pulp Co.,* 181 Wash. 1, 42 P. (2d) 19; *Peabody v. Star Sand Co.,* 186 Wash. 91, 56 P. (2d) 1018.

■ A chattel mortgage is essentially a contract and is governed by the same rules of construction as those applicable to contracts generally, the primary object being to ascertain and give effect to the intention of the parties as disclosed by the instrument itself. 10 Am. Jur. 798, Chattel Mortgages, § 128; 14 C.J.S. 718, Chattel Mortgages, § 104.

■ Having held the contract to be valid, the trial court should have given it effect and, upon the theory that the respondent was the owner of the business and property to the extent designated in the contract, and that the appellant was simply the manager of the business and the mortgagee in possession of the property, should have required a complete accounting up to the time of trial, or to some other prior definite period, subject to further accounting for subsequent periods.

The judgment of the trial court is set aside and held for naught, and the cause will be remanded to that court for further proceedings consistent with the views herein expressed, without prejudice to the right of either party to introduce further evidence, if so desired, upon the issues presented.by the pleadings in the case, or to the right of the trial court further to consider and determine such issues upon the evidence already introduced, or to be introduced, or to the right of either party to appeal from any portion of any judgment that may be entered by the trial court upon a further hearing by it.

SIMPSON, C. J., ROBINSON, and JEFFERS, JJ., concur.

MALLERY, J. (dissenting)—I dissent. I think clause number seven of the contract and the facts in the case sustain the trial court in treating the account as closed as of January, 1942. I do not agree that at the next proceedings the account should be brought down to date. The judgment should be affirmed.