[No. 28553.  Department One.  April 2, 1942.]

GRAND AERIE, FRATERNAL ORDER OF EAGLES, *Respondent*, v. NATIONAL BANK OF WASHINGTON, KENT BRANCH, *Respondent*, WILLIAM COULTER *et al., Appellants*, KENT AERIE No. 362, FRATERNAL ORDER OF EAGLES, *Appellant*.[1]

[1]Reported in 124 P. (2d) 203.

*C. A. Schneider* and *Lloyd R. Savage,* for appellants.

*Bert C. Ross,* for respondent Grand Aerie, Fraternal Order of Eagles.

*Metzger, Blair & Gardner,* for respondent National Bank of Washington, Kent Branch.

MAIN, J.—This action was brought by the plaintiff, the Grand Lodge of the Fraternal Order of Eagles, against the Kent Branch of the National Bank of Washington, for the purpose of recovering a deposit which that bank had and credited to the Kent Aerie, Fraternal Order of Eagles. In addition to the bank, three officers of the Kent aerie were made defendants, in their individual capacity. After the action was instituted, the Kent aerie was made an additional party.

The bank appeared by answer and cross-complaint, which was in the nature of an interpleader, stating the capacity in which it held the funds and its willingness to pay them over to whoever was entitled to the same. The individual defendants answered by certain denials and a cross-complaint, and sought a judgment setting aside an order of the grand lodge which suspended the charter of the Kent aerie, suspended five of its members for an indefinite period, and expelled five others. The Kent aerie, the additional defendant, answered by certain denials and a cross-complaint, asserting its right to the funds in the bank.

The principal issue presented by the pleadings was whether the action of the grand lodge, in suspending

the charter of the Kent aerie, suspending five of its members, and expelling five, was a valid exercise of the power of the grand lodge.

The trial to the court without a jury resulted in comprehensive findings of fact from which it was concluded that the procedure leading up to the suspension of the charter, the suspension of five members of the Kent aerie, and the expulsion of five was valid, and that the money in the bank should be paid over to the secretary of the grand lodge, who should hold it in trust until such time as it would be determined whether the charter of the Kent aerie would be reinstated. The bank thereupon paid the money as directed. Judgment and decree were entered in accordance with the findings of fact and the conclusions, from which all of the defendants appealed.

The facts are somewhat complicated, and to make a statement of them which would be reasonably clear is attended with some difficulty. The Grand Lodge of the Fraternal Order of Eagles was incorporated under the laws of this state on or about May 13, 1898. In the articles, it is provided that the principal place of business of the association should be "at Seattle, King County, State of Washington." After the incorporation, the grand lodge prepared, and adopted, a constitution and laws for its guidance, and also for the guidance of the subordinate lodges. When a charter was issued to a subordinate lodge, that lodge and the members thereof were obligated to obey the constitution, laws, and regulations of the grand lodge. Specific provisions were made for the disciplining of a subordinate lodge or the officers or members thereof when the laws of the grand lodge were not complied with. The procedure to be followed in any such case was comprehensive and explicit.

The constitution adopted by the grand lodge pro-

vided that the office of the grand worthy president should be "in Kansas City, Missouri," and that office has been continuously maintained in that city. The constitution of the grand lodge provides for the naming of a deputy grand worthy president who shall act in the absence of the president.

The suspension of the charter and of the members of the lodge mentioned and the expulsion of the others was the result of a trial before the grand lodge trial commission, from which order of suspension and expulsion an appeal was taken to the grand lodge, and the order of the grand worthy president in suspending the charter of the Kent aerie and certain of its members, and expelling others, was sustained, except in a minor particular which is not here material.

The constitution and laws of the grand lodge provide that, when a subordinate lodge surrenders its charter or when such charter is revoked, all the property, both real and personal, belonging to such lodge, and all of its money, books, papers, and paraphernalia, and other possessions of value, shall be transferred to the secretary of the grand lodge, who shall become the custodian of such surrendered property and effects.

It is further provided in the constitution and laws that, if any such local lodge shall be reorganized within six months after its charter has been suspended or revoked, the property and effects shall be restored to it, and if such lodge is not reorganized, such property and effects shall become the absolute property of the grand lodge.

During the trial of the case in the superior court, it was stipulated by the grand lodge that, in case the judgment of this court should be in favor of it, the six months' period should be considered to begin to run from the date of the entering "of the judgment of the court herein." The grand worthy president offered

to reinstate the charter of the Kent aerie if fifty of its members would sign a request stating that they would obey the constitution and laws of the grand lodge; but fifty members did not sign the application cards, and the result was that the case is here for determination upon the record as made.

The first thing to determine is the scope of the inquiry which the court will make in a case of this character. In the case of *Kelly v. Grand Circle Women of Woodcraft*, 40 Wash. 691, 82 Pac. 1007, it was held that the expulsion of a member from a mutual benefit association would not be inquired into by the courts, except to ascertain whether the proceedings were regular, in good faith, and not in violation of the laws of the order or the laws of the state. It was there said:

"In cases of this kind 'courts never interfere, except to ascertain whether or not the proceeding was pursuant to the rules and laws of the society, whether or not the proceeding was in good faith, and whether or not there was anything in the proceeding in violation of the laws of the land.' *Connelly v. Masonic Mut. Benefit Ass'n*, 58 Conn. 552, 18 Am. St. 296, 9 L. R. A. 428."

The next question is whether or not the grand lodge had a right to establish its official office in Kansas City, Missouri, in view of the fact that the articles of incorporation provided that the principal place of business of the corporation should be at Seattle. Even though the articles of incorporation provided that its principal place of business should be in this state, it nevertheless had a right to transact its business elsewhere. 14 C. J. 339, § 416; *Hastings v. Anacortes Packing Co.*, 29 Wash. 224, 69 Pac. 776.

The next question is whether the orders issued out of the Kansas City office by the deputy grand worthy president, and signed by a facsimile rubber

stamp signature of the grand worthy president, are valid and binding orders. The evidence shows that these orders were issued with the knowledge and approval of the grand worthy president. It had been the practice for years for the deputy grand worthy president to issue such orders in view of the fact that the grand worthy president was, much of the time, traveling about visiting the subordinate lodges of the order, of which there were a very large number. The question of whether the signature by the deputy grand president made the order valid was a question of intent, and from what has already been said, it was the intent of the grand worthy president that they should be valid and binding orders.

In the case of *Buckner v. Ridgely Protective Ass'n,* 131 Wash. 174, 229 Pac. 313, it was said:

"It was not necessary to the validity of the request blanks that they be signed by the insured with his own hand. He was at liberty to adopt any form of signature he so chose. The question is always one of intent, and the cases are uniform in holding that a printed or stamped signature, or a signature written by another than the person to be bound, is valid and binding if the person to be bound directs it to be so written, or accepts it as his own."

In this connection, our attention is called to the fact that the impression of the seal of the grand lodge was not made by the secretary thereof, but by the deputy grand worthy president. Under the laws of the order, the seal was in the custody of the secretary, and he was the one to make use of it. The irregularity in this case, if it be such, by reason of the fact that the impression of the seal was made by the deputy grand worthy president, appears to be not at all material.

The next question is whether the property of the Kent aerie, which stood in the name of the cor-

poration of that aerie, could be turned over to the grand lodge.

In 10 C. J. S. 310, § 64, subd. (d), it was said:

"Under the constitution of a fraternal association consisting of a supreme lodge and subordinate lodges, authorizing the supreme protector to appoint deputies and providing that on the suspension of a subordinate lodge its officers must deliver up its charter and property to the supreme protector or deputy, etc., the right of the members of a subordinate lodge to its property is simply an incident to their membership, and the right is merely the right to use the property during the meetings of the lodge."

It may be admitted that on this question the authorities throughout the country are not entirely in uniformity, but this court has adopted the rule that, even though the property be held in the name of the corporation of the subordinate lodge, upon suspension or revocation the property becomes that of the grand lodge, if the constitution so provides, as it does in the case before us.

In the case of *Grand Court of Washington, Foresters of America v. Hodel,* 74 Wash. 314, 133 Pac. 438, 47 L. R. A. (N. S.) 927, it was said:

"No number of the members of the order less than the whole could, therefore, divert the funds to other uses than the uses defined in the constitution and laws of the order. The majority of any subordinate court can undoubtedly direct the use of the funds of the order for purposes of the order, and when there are two or more purposes for which the funds can be lawfully used, may select between them, but the majority cannot, against the will of the minority, lawfully divert such funds for uses other than those permitted by the constitution and laws of the order. This, as we understand the authorities, is the universal rule. [Citing authorities.]

"Some time after the institution of Court Enterprise No. 3, an attempt was made to incorporate the court

under the statutes relating to the incorporation of fraternal societies. It may be questioned, we think, whether the proceedings were sufficiently regular to accomplish the purposes intended. But were the facts otherwise, the rule with relation to its property would not be changed. Its funds would still be trust funds, subject to such disposition as the laws of the order permitted to be made of them, and could not be diverted to a use contrary to such laws without the unanimous consent of the members of the order."

In the case of *State ex rel. Butterworth v. Frater,* 130 Wash. 501, 228 Pac. 295, after stating that, in a nonprofit voluntary association, courts will take jurisdiction when the controversy relates to property rights, as this was an exception to the general rule that a subordinate lodge is governed by the laws of the grand lodge, and that courts will not interfere if the procedure is in accordance with those laws, it was said:

"It is claimed, however, that, because the Seattle local lodge is incorporated in this state, a different rule should be applied, and that the law as it relates to domestic corporations in regard to the holding of elections should be enforced. As we view it, this argument is without merit; for, although the lodge may be incorporated in this state, still it is but a subsidiary of the parent lodge and its members are governed by the agreement which they entered into when joining the organization. Courts will not interfere in disputes of this nature where the organization amply provides for their determination, unless, as stated, some pecuniary or property loss is threatened the person seeking the aid of the courts."

We now come to the question of whether the procedure in this case leading up to the suspension of the charter, the suspension of certain members, and the expulsion of others was in accordance with the constitution and laws of the grand lodge. The trial court expressly found:

"That the Mandate of the Grand Worthy President, hereinabove referred to, was issued pursuant to the findings of a Trial Commission created under the Constitution and laws of the plaintiff, and pursuant thereto, which said Trial Commission adjudged Aerie Number 362, the defendants William Coulter and Joseph Hougardy, together with other members of said Aerie, to be guilty of violations of the Constitution and laws of the plaintiff; that the steps taken leading up to said trial, said trial, the findings of the Trial Commission and the Mandate of the Grand Worthy President, were all in accordance with and pursuant to the Constitution and laws of the plaintiff."

It thus appears that the trial court was of the opinion that there was no defect in the proceedings, and that they were all in accordance with the constitution and laws of the grand lodge.

To review these various steps would extend this opinion to an unreasonable length, and, as we view it, would serve no useful purpose. We believe it sufficient to say that, after considering the record in the case, we are of the opinion that the trial court's view was correct.

The judgment and decree appealed from will be affirmed.

ROBINSON, C. J., MILLARD, STEINERT, and DRIVER, JJ., concur.