The record contains so many facts essential to a complete understanding of the issues of *Page 547 
law and fact that I deem it necessary to add much to the statement contained in the majority opinion.
This action was instituted for the purpose of securing a declaratory judgment defining the rights of the Washington Local Lodge No. 104 of the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, and its parent, or superior, organization, known as the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America. The right sought to be determined was whether, under the international and subordinate lodge constitutions, the plaintiff local had the right to fix and regulate the salaries of its elective and appointive officers without the consent of the parent union. Another purpose of the action was to secure a temporary restraining order enjoining the defendants from:
"(1) Interfering with the right of Lodge No. 104 to fix and regulate the salaries of its elective and appointive officers;
"(2) Paying any salaries to said officers except as authorized by the members of Lodge No. 104;
"(3) Seizing or attempting to seize, either by force or otherwise, the control and management of Lodge No. 104;
"(4) Depriving Lodge No. 104 of its records, property or funds; and
"(5) Suspending or revoking the charter of Lodge No. 104."
The answer put in issue the questions presented in the complaint and set up affirmative defenses which will be reflected in the facts which I will mention.
A temporary restraining order was entered in compliance with the request contained in the complaint.
The case was tried to the court. At the conclusion of the trial, the court took the case under advisement and then, after study, filed his memorandum opinion. In that opinion, he thoroughly reviewed all of the facts presented at the trial and applied the law relating to those facts. Thereafter, the court made its findings of fact and conclusions of law and then entered its decree, the pertinent portion of which reads: *Page 548 
"NOW, THEREFORE, it is ORDERED, ADJUDGED AND DECREED that the Complaint of the plaintiffs herein be and the same is hereby dismissed with prejudice only as to the matters now embraced within the pleadings and issues herein.
"It is further ORDERED, ADJUDGED AND DECREED that the restraining order issued herein on the 23rd day of May, 1946, and the temporary injunction modifying the said restraining order entered herein pendente lite on the 14th day of June, 1946, be and the same are hereby vacated and dissolved."
A motion for new trial was made and denied.
Plaintiffs then appealed. Their assignments of error properly challenge the findings and decree of the trial court.
As alleged in appellants' complaint, and as stated in the majority opinion, "Local 104 is a voluntary association organized as a labor union, chartered by the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, which is also a voluntary association." The International and its subordinate unions are governed by a constitution and by certain by-laws. I set out their pertinent portions, capitalizing their most important features, and underscoring those portions not mentioned in the majority opinion, as follows:
 "ARTICLE I.
"Name, Authority and Location of International Lodge.
"Section 1. THIS ORGANIZATION SHALL BE KNOWN AS THE INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS AND HELPERS OF AMERICA, AND SHALL BE COMPOSED OF SUBORDINATE LODGES.. . .
 "Government.
"Sec. 2. THE INTERNATIONAL BROTHERHOOD HAS FULL JURISDICTION OVER ALL SUBORDINATE AND DISTRICT LODGES AND IS THE HIGHEST TRIBUNAL OF THE INTERNATIONAL BROTHERHOOD.
 "Power.
"Sec. 3. THE POWERS OF THE INTERNATIONAL BROTHERHOOD, WHILE IN SESSION, SHALL BE LEGISLATIVE, JUDICIAL AND EXECUTIVE.
 "Officers.
"Sec. 4. The International Officers shall consist of anInternational President, Assistant International President,International Secretary-Treasurer, Editor and Manager of theOfficial Journal, and thirteen (13) InternationalVice-Presidents *Page 549 from the Boilermakers, Iron Ship Builders, Welders and Helpers,two (2) of whom shall be from Canada.
 "Executive and Judicial Authority.
"Sec. 5. THE EXECUTIVE AND JUDICIAL POWERS ONLY, OF THE INTERNATIONAL BROTHERHOOD WHEN NOT IN SESSION, SHALL BE VESTED IN AN INTERNATIONAL EXECUTIVE COUNCIL OF THE INTERNATIONAL BROTHERHOOD, WHICH SHALL CONSIST OF THE INTERNATIONAL PRESIDENT, ASSISTANT INTERNATIONAL PRESIDENT AND ALL OF THE INTERNATIONAL VICE-PRESIDENTS. . . .
 "Supervision and Meetings of Executive Council.
"Sec. 7. The International Executive Council shall havesupervision over the Order when the International Brotherhood isnot in session. Its meetings shall be held annually, unlessconditions warrant special meetings. THEY SHALL HAVE THE POWER TO PASS ON ANY SUBJECT, PROPOSITION OR GRIEVANCE, HEAR AND DETERMINE ALL CASES OF APPEAL FROM THE DECISIONS AND RULINGS OF THE SUBORDINATE LODGES, OR AGAINST ANY OFFICER OF THIS INTERNATIONAL BROTHERHOOD OR APPOINTED OFFICER, AND ALL DECISIONS OF THE EXECUTIVE COUNCIL SHALL BE FINAL AND IN FULL FORCE UNTIL REVERSED BY THE INTERNATIONAL BROTHERHOOD IN CONVENTION ASSEMBLED.
 "Adjustment of Grievances
"Sec. 8. WITH THE CONSTITUTION AS ITS GUIDE THE INTERNATIONAL EXECUTIVE COUNCIL SHALL HEAR AND DETERMINE ALL GRIEVANCES REFERRED TO IT, RECOMMEND A REMEDY OR ADJUST THE SAME AS THE GRAVITY OF THE CASE MAY REQUIRE. . . .
 "ARTICLE II. "Convention.
"Section 1. Conventions of this International Brotherhoodshall be held every four (4) years, the first Tuesday inSeptember to be the date for the convening of the convention,unless otherwise changed by referendum vote. . . .
 "ARTICLE IV. "Duties of International Officers. "President.
"Section 1. The International President shall countersign allorders for payment of money. HE SHALL BE EMPOWERED TO SUSPEND SUBORDINATE LODGE MEETINGS, APPOINT OFFICERS PRO-TEM OF BOTH THE INTERNATIONAL BROTHERHOOD AND OF SUBORDINATE LODGES AND ALL COMMITTEES NOT OTHERWISE PROVIDED FOR, including governingboards for Subordinate Lodges whose meetings may have beensuspended. He *Page 550 shall be empowered to deputize any member of the Order in goodstanding to perform any of the duties of his office which timeand distance may prevent him from doing personally. HE SHALL HAVE THE DIRECTION AND SUPERVISION OF ALL SUBORDINATE AND DISTRICT LODGES, AND BE EMPOWERED TO SUSPEND THEIR INDIVIDUAL MEMBERS, OFFICERS OR LODGES WHEN, IN HIS JUDGMENT, THE ACTIONS OF SUCH MEMBER, OFFICER OR LODGE ARE IN VIOLATION OF THE INTERNATIONAL CONSTITUTION OR THE SUBORDINATE LODGE CONSTITUTION, OR ARE IN VIOLATION OF THE DECLARED POLICIES OF OUR INTERNATIONAL BROTHERHOOD. . . .
"Sec. 6. The International President shall have the fullcontrol of the work of organization and shall assignInternational Vice-Presidents to any section under thejurisdiction of the Order, to transact any business that may beassigned to them; being empowered to appoint International orDistrict Representatives in such localities and for such term andduties as he may designate. . . .
 "Decisions.
"Sec. 9. THE INTERNATIONAL PRESIDENT MAY HEAR AND DECIDE ALL QUESTIONS OF CONSTITUTIONAL LAW SUBMITTED TO HIM BY SUBORDINATE AND DISTRICT LODGES, AND ALL DECISIONS SHALL BE BINDING UNTIL FINALLY PASSED ON BY THE INTERNATIONAL EXECUTIVE COUNCIL OR INTERNATIONAL CONVENTION.
 "Emergency Council Session.
"Sec. 10. The International President in a case of extremeemergency is hereby authorized when the interest of thisInternational Brotherhood demands it, to convene theInternational Executive Council in special session to determinesuch matters as may be brought before it. . . .
 "SUBORDINATE LODGE CONSTITUTION. "ARTICLE II. "Officers and Their Duties.
"Section 1. The Officers of each Subordinate Lodge shallconsist of a President, Vice-President, Treasurer, Inspector,Inside Guard, Outside Guard, Recording Secretary, FinancialSecretary and Corresponding Secretary, three Trustees and aBusiness Agent, where one is considered necessary. . . . Anydeviation from this section must have the approval of theInternational President, subject to confirmation by theInternational Executive Council. A combination of Offices in theSubordinate Lodge will be permitted, subject *Page 551 to approval of the International President, in which case onlyone Bond will be required.
 "Duties of the Treasurer.
"Sec. 7. . . .
"The Treasurer shall pay all orders that may be drawn and signed by the Recording Secretary, attested by the President and seal of the Subordinate Lodge, after the same being ordered paid by a majority of the members present in good standing at a meeting of the Subordinate Lodge. . . . Any deviation from this section must have the approval of the International Secretary-Treasurer. . . .
 "ARTICLE III. "Nomination and Election of Officers.
"Sec. 5. The term of all Officers shall be for Four (4) yearsfrom July 1 or until their successors are elected and installed.Any vacancies filled by election for the unexpired term of anyOfficer shall be for the length of such term only. (No nominationor election under this section shall be held except to fillvacancies until May and June respectively of 1948.) This Sectionincludes District Lodges other than Railroad Districts. Thereshall be no deviation from this section without the consent ofthe International Executive Council. . . .
 "ARTICLE XV. "Miscellaneous.
"Section 1. The funds of the Subordinate Lodge shall not beloaned or appropriated AND SHALL BE USED ONLY FOR THE LEGITIMATE EXPENSES OF THIS INTERNATIONAL BROTHERHOOD. Any variations fromthe restrictions in this Section, shall first be approved by theInternational President.
"Sec. 2. THE FUNDS AND PROPERTY OF A SUBORDINATE LODGE ARE TRUST FUNDS FOR THE BENEFIT OF ITS MEMBERS, AND SHALL NOT BE DIVIDED IN ANY MANNER AMONG THE MEMBERS OF THE SUBORDINATE LODGE.. . .
 "Government Between Conventions.
"Sec. 22. Between Convention sessions of this InternationalBrotherhood, the Subordinate Lodges of the Brotherhood shall havepower to initiate propositions for legislative enactment by theInternational Brotherhood at large, as heretofore provided for inArticle X, Sections 1 and 2, International Constitution."
The only reference to the salary of local officers is contained in section 6 of the Local's by-laws (exhibit No. 59) reading as follows: *Page 552 
"Section 6. THE OFFICERS SHALL BE PAID A REGULAR SALARY WHEN FULL TIME IS TAKEN BY THEIR DUTIES. No members serving oncommittees shall be paid unless actual working time is lost insuch service as approved by the Local."
The questions for determination presented in this case are: first, the scope or extent of the inquiry, or interference by the courts into the controversies or internal affairs of labor unions; second, the extent of the power of the International president and executive council with reference to the salaries of elective and appointive officers of a subordinate lodge; third, whether the affirmative defenses are established by the evidence and are tenable in law.
The controversy between appellant lodge and its parent organization really started over the action of the International Convention in 1944, at which time the convention, by amendment of its constitution, provided that the terms of all local officers should be four, instead of one, year. The delegates from appellant lobbied and voted against the passage of the amendment and, shortly after the amendment was passed, began an agitation for an election. The International President, Charles J. MacGowan, in the hope of restoring harmony in the Local, suggested that the officers resign so that a new election could be held. The procedure was followed, and new officers were elected in 1945. Plans by some dissatisfied members were made for forcing an election in 1946. However, the International refused the request for following the procedure of 1945.
Early in 1945, it became apparent that the membership of the Local, known as 104, would be diminished, and while there had been accumulated assets of approximately six hundred thousand dollars by the Local, it was apparent that those funds would be consumed because of the fact that the expenses of the lodge were far in excess of its income. In April of 1945, the trustees and executive board were instructed to bring in recommendations to effect economies so that the Local could operate within its current income. Prior to that time, the International president had written the secretary of Local 104, suggesting a reduction *Page 553 
of the expenses by curtailing the publication of its newspaper. At that time the office of one assistant business agent was abolished, and a reduction was made in car expense. Even with that reduction, the shortage in 1945 was forty thousand dollars. The trustees made a recommendation that the salaries or wages of officers should be reduced, although their salaries had been fixed at varying figures prior to the time of their election. Protest was then made against the reduction of wages and salaries of the appointed and elected officials. The International president then appointed Vice-President William Williams, in charge of the North Pacific area, as his agent, to make an investigation of the affairs of appellant, and make a report to the International president. Mr. Williams made the examination, and sent his recommendation and report to the president on January 14, 1946.
January 26, 1946, appellant Local 104 met and considered both the recommendations of their trustees and of Mr. Williams, and adopted the recommendation of its board of trustees. The meeting opened with 275 persons present, but it lasted so long that only 38 members participated in the last vote taken.
February 15, 1946, one of the officers, Mr. McKillop, protested with reference to his reduction of salary and sent a copy of the protest to the International president. Thereafter, International President MacGowan, under date of March 11, 1946, advised appellant Local that a hearing would be held before the International executive council in Denver on April 8, 1946, the purpose being to fully inquire into the situation in the local organization. He summoned to that meeting Mr. Toner, president, Mr. O'Neill, business agent, Mr. McKillop, assistant business agent, and Joe Clancy, secretary, of Local 104, to appear at the Denver meeting. After appellant had received the communication, it elected four of its members, independent of those called, to attend the meeting of the executive council. All of the men summoned, and those elected, appeared before the council at its meeting in Denver. At that meeting, all eight of the members of appellant made statements to the International *Page 554 
executive council concerning the reduction of salaries. After the members of appellant Local had been heard, the council went into executive session and then recessed to reconvene in Kansas City. The executive council then decided that the salary of the officers of appellant Local should be restored retroactively. President MacGowan communicated the result to appellant, by letter to Mr. Toner, its president, Mr. O'Neill, its business agent, and Mr. Clancy, its secretary, under date of May 8, 1946. That letter read as follows:
"Dear Sirs and Brothers:
"Further in connection with the appearance of the delegates representing Lodge 104 before the International Executive Council — the subject matter received the very earnest consideration of the Council and after much discussion and deliberations the following two-fold action was taken:
 "`1. After careful consideration of all factors in the matter your Committee recommends that Lodge 104, Seattle, Washington be directed to immediately restore, retroactive to the date the reduction was effective, the salary of each of the salaried officers of that lodge to the amount received by them prior to the recent action of Lodge No. 104 reducing their salaries.'
 "`2. After careful consideration of the matter your Committee recommends that a committee composed of three members of the Executive Council be appointed who shall go to Seattle, Washington and hold or conduct extended hearings in Lodge No. 104 to secure all factual information possible from its officers and members relative to any complaints and controversies existing in that lodge. That after holding these hearings, the Committee shall prepare and submit a comprehensive report of their findings with recommendations to the International President and he is empowered by the Executive Council to apply and enforce such recommendations as he and the Committee may deem necessary to correct any inequities found and to re-establish a condition of harmony within Lodge 104.'
"In accordance with the foregoing, the Executive Council designated Vice-Presidents Tom Crowe, O.W. Mursener and Wm. Williams as a committee to go to Seattle and attempt to reconcile the difficulties in Lodge 104. Failing to *Page 555 
secure an agreement between the contending parties the Committee is to hold an extended investigation and hear the statements of all parties at interest after which they will make certain recommendations to the undersigned.
"May I therefore request that the officers and members of Lodge 104 cooperate with these representatives of the Executive Council in doing everything within reason to restore harmony to the troubled affairs of Lodge 104."
Appellant lodge held a meeting May 18, 1946, and voted to hold in abeyance the directive relative to the salaries until such time as the committee of the International vice-president should have rendered its report, whereupon International president notified Mr. Toner, Mr. O'Neill, and Mr. Clancy on May 20, 1946, that the salary situation was a closed matter, and that the Local had received its directive from the parent organization. Thereafter, Mr. Toner, as president, requested Mr. Clancy to prepare the necessary checks to comply with the International's order and pay the salaries as therein directed. Mr. Clancy delayed the preparation of the checks in order that this action might be instituted on the twenty-second day of May, 1946.
Based upon these facts, the trial court rendered its memorandum opinion, as I have indicated. That memorandum opinion so clearly indicates to my mind the proper conclusion to be reached that I quote it in full and adopt it as my dissent. There is no escape from the conclusions reached by the trial judge as to the factual situation. The trial court without any hesitation decided upon the facts presented to him. His decision in that respect should be upheld by this court, because he is a better judge of the credibility of the witnesses, and the weight to be accorded their testimony, than we can possibly be. He properly applied the law to those facts in line with the decisions of this court, and the decisions of other courts of the United States. The memorandum opinion is as follows:
 "1. Scope or extent of inquiry or interference by the courts in the internal affairs of labor unions.
"As a general rule, the courts will not interfere with the internal affairs of an unincorporated association, such as a labor union, so as to settle disputes between the members, *Page 556 
or questions of policy, discipline, or internal government, so long as the government of the society is fairly and honestly administered in conformity with its laws and the law of the land and no property or civil rights are invaded, and under such circumstances, the decision of the governing body or established private tribunal of the association is binding and conclusive, and not subject to review or collateral attack in the courts. Even in cases otherwise warranting judicial interference, the courts will not, as a rule, take jurisdiction unless the complainant has exhausted such remedies as may be provided by the laws of the association itself. 7 C.J.S., Title Associations, Paragraph 34, pp. 34 and 35. See also 63 C.J., Title Trade Unions, Paragraphs 82 and 83, p. 701; Snay v. Lovely, (Mass.)176 N.E. 791.
"Our Supreme Court has adopted the general rule subject to the above-noted exceptions.
"In the case of Constantino v. Moreschi, 9 Wn.2d 638, 653, our supreme court said:
"`(3) Holding as we do that appellant local is and has been a member of the Western Washington District Council, and as such member is amenable to its constitution and by-laws, and to the constitution and by-laws of the International, Local 440 is not entitled to apply to the courts for relief, for the reason that it has not exhausted the remedy provided by its own organization. The facts in this case do not bring appellant local within the exception noted in Local Lodge No. 104 etc. v. InternationalBrotherhood etc., 158 Wn. 480, 291 P. 328.
"`There is no question but that, under article 10 of the constitution and by-laws of the council, Local 440 could and should have presented to the executive board of the council any grievance it may have had against the council, and that, if it felt aggrieved by the action of the trial board, it should then have taken an appeal to the executive board of the international. Neither is there any question but that, if appellant local felt aggrieved by any order or decision of the international president, it could have had such order or decision reviewed by the executive board of the international. Appellant local failed and refused to exhaust either of these remedies, after two opportunities were afforded it to appear before the executive council of the international.
"`Clearly, under article 13 of the constitution and by-laws of the council, appellant local is prohibited from resorting to any court of law or equity, until and unless it has first exhausted the remedies provided by the constitution, rules *Page 557 
and practice of the international, the constitution and by-laws of the council, and the constitution and by-laws of the local. In this connection, we desire to refer to the early case of Hermanv. Plummer, 20 Wn. 363, 55 P. 315.'
"In the case of Grand Aerie, Fraternal Order of Eagles, v.Nat. Bank of Washington, 13 Wn.2d 131, the supreme court said at page 135:
"`(1) The first thing to determine is the scope of the inquiry which the court will make in a case of this character. In the case of Kelly v. Grand Circle Women of Woodcraft, 40 Wn. 691,82 P. 1007, it was held that the expulsion of a member from a mutual benefit association would not be inquired into by the courts, except to ascertain whether the proceedings were regular, in good faith, and not in violation of the laws of the order or the laws of the state. It was there said:
"`"In cases of this kind `courts never interfere, except to ascertain whether or not the proceeding was pursuant to the rules and laws of the society, whether or not the proceeding was in good faith, and whether or not there was anything in the proceeding in violation of the laws of the land.' Connelly v.Masonic Mut. Benefit Ass'n, 58 Conn. 552, 18 Am. St. 296, 9 L.R.A. 428."'
"The cases cited by counsel for plaintiff in this connection are based upon exceptions to the general rule. Thus, in the cited case of Cox v. United Brotherhood of Carpenters, 190 Wn. 511, it was held that a local lodge could resort to the courts where the supreme lodge revoked its charter without notice and without warrant of their own law.
"In the cited case of Ray v. Brotherhood of Railway Trainmen,182 Wn. 39, being an action by a widow upon a death benefit certificate of her deceased husband, our supreme court held, Syllabus 1:
"`(1) Insurance (211) — Beneficial Associations (3) — Membership — Resort to Courts. The courts will protect the rights of members and beneficiaries of mutual benefit associations against unlawful or capricious action on the part of the association, but will not review the decision unless a clear case of injustice is shown.'
"In the cited case of Local Lodge No. 104 vs. InternationalBrotherhood of Boilermakers, 158 Wn. 481, — an action to recover on an indemnity bond — it was held that the international's constitution as then constituted concerned matters *Page 558 
of internal discipline, and not disputes over money or tangible property. It is observed that this case is distinguished in the later case of Constantino v. Moreschi, supra.
"In the cited case of Furniture Workers Union vs. UnitedBrotherhood of Carpenters, 6 Wn.2d 654, — a case involving the deprivation of a local lodge of its charter and records, and the seizure of its property without notice, charges or trial — it was held that the action of the parent organization was arbitrary and capricious.
"The above-stated general rule is, in my opinion, applicable to the case at bar, unless (1) the controversy herein be a controversy over money or tangible property, (2) the action of the international is void because of caprice or illegality, or (3) its appellate procedure in practical effect amounts to a denial of justice.
 "(1) Applicability of Declaratory Judgment Statute.
"While it was contended during the trial and on oral argument by counsel for the plaintiffs that this was merely an action for a declaratory judgment construing a contract between the local and international, I am of the opinion that this is an equitable action in which the plaintiffs seek not only a declaratory judgment but also equitable relief. This is evidenced not only by (1) the allegations of the complaint (see Paragraphs V and VI of complaint), (2) the prayer of the complaint, but also by the application pendente lite for injunctive relief. Indeed the general purport of the complaint cannot be restricted by limiting its prayer to one for a temporary injunction, because injunctive relief is primarily and peculiarly within the province of courts of equity (43 C.J.S., Title Injunctions, Paragraph 1, p. 405), and the court in equity, having obtained jurisdiction for any purpose, will retain such jurisdiction for all purposes (30 C.J.S., Title Equity, Paragraph 67, p. 414.) Furthermore, the court in the case at bar must make some disposition of the restraining order or temporary injunction entered hereinpendente lite.
"Nor does this case, in my opinion, fall within the statute relating to declaratory judgments (Paragraph 784, Rem. Rev. Stat. (Supp.) because (1) the declaration must be either affirmative or negative in form and effect, and (2) because no justiciable controversy, within the purview of the declaratory judgment statute, appears either from the allegations of the complaint or the evidence herein. Inasmuch as there is no evidence herein that the international has threatened or taken any steps to suspend, *Page 559 
expel or disassociate Local 104 or any of its members, or deprive such local of any of its records, property or funds, or to seize control of such local, without notice, charges or trial or opportunity to be heard, the case at bar, so far as the declaratory judgment statute is concerned, in my opinion falls within the decision of our supreme court in the case of Adams v.Walla Walla, 196 Wn. 268, wherein the supreme court said (p. 270):
"`No strike or restraint by the city of patrolling or loitering, pursuant to the ordinance in question, has been alleged, nor has any actual enforcement thereof, with respect to appellants, been shown. There is nothing alleged but a remote, contingent peril to appellants. Any decision at this time, in the absence of any controversy, would be purely academic. Borchard on Declaratory Judgments (1934), 44. We are compelled to conclude that no justiciable issue has been presented to entitle appellants to invoke the declaratory judgments act. * * *'
"The cases cited by counsel herein of Associated IndemnityCorp. v. Wachsmith, 2 Wn.2d 679, and Trinity Universal Ins.Co. v. Willrich, 13 Wn.2d 263, — both being cases to have liability determined on insurance policies — are, in my opinion, clearly distinguishable from the case at bar.
"It is admitted in plaintiffs' complaint herein that neither the international nor subordinate lodge constitutions contain any provision which fixes or provides a method for fixing or regulating the salaries of the elective and appointive officers of subordinate lodges. It bases its right to fix, increase or decrease such salaries upon an alleged custom, which, it alleges, was followed without objection on the part of the international. (See Paragraph IV of complaint.) Its complaint is predicated upon a custom or equitable estoppel, rather than upon contract. However, the contract between the parties herein consists not only of the constitutions, approved by-laws, and duly adopted regulations but also the oaths and obligations taken by the members and officers. Snay v. Lovely, (Mass.) 176 N.E. 791.
"I therefore conclude that the declaratory judgment statute has no application in the case at bar.
"I shall, however, make findings of fact and conclusions of law in this action for convenience and clarity, and the convenience and use of counsel and the supreme court in event of appeal. Such findings of fact may be essential in *Page 560 
some actions for declaratory judgments. (See AssociatedIndemnity Corp. v. Wachsmith, 2 Wn.2d 679.)
 "(2) Is the Controversy Herein One of Policy or Internal Lodge Government Rather than One Involving Property Rights?
"Inasmuch as the directive or order of the international president here in question neither seeks to take nor sequester any property of the local for the benefit of the international, but rather directs the local to pay to its officers the salary fixed at the time of their election, it would seem that the controversy herein is one of policy or internal government, rather than one involving property rights.
"The cited cases, supra, based upon the exception to the general rule, are cases in which either the parent lodge sought to seize property belonging to the local, or denied liability upon obligations due from it to the local or members. (See Coxv. United Brotherhood of Carpenters, 190 Wn. 511; Ray v.Brotherhood of Railway Trainmen, 182 Wn. 35; Local Lodge No.104 v. International Brotherhood of Boilermakers, 158 Wn. 481. ) None of such cases deal with salaries of officers of locals, unions or lodges.
"Inasmuch as the local's claim of the right to decrease the salaries of its officers is based upon an alleged local custom, rather than the lodge constitutions or by-laws, it would seem that the controversy is one of policy or internal lodge government, rather than one involving property rights. And especially is this true in view of the fact that it appears from a preponderance of the evidence (1) that the action of the local in reducing such salaries was contrary to the long-established policy of the international brotherhood, and (2) that such action was taken by the local after it had been directed not to do so by the officers of the international, and (3) that at the time of such action such local had before it a plan for economies submitted by the international.
"The evidence introduced by the local in support of its claim of right, by reason of custom, to reduce the salaries of its elective and appointive officers without their consent, merely shows that the international had not theretofore objected either to the initial fixing by the local of the salary of its officers, or raising of their salaries. There is no evidence that thelocal had in the past reduced such salaries during the terms ofsuch officers without their consent. On the other hand, it appears from a preponderance of the evidence that it had long been the policy or custom of the *Page 561 
international and its local lodges to never decrease the salaries of local or international officers.
"It therefore appears (1) that the plaintiff local has failed to establish by a preponderance of the evidence that either a general or local custom existed for the reduction of the salaries of officers, without their consent, during the term of their office, and (2) that if such custom did exist it was contrary to the established policy of the international and its subordinate locals.
"A custom in order to be valid must be ancient, certain and uniform, compulsory, consistent, general, reasonable and not in contravention of law or public policy. 25 C.J.S., Title Customs and Usages, Paragraphs 1-10, pp. 77, 88.
"Whether a local custom contravenes the general rule, custom or policy of the international, is primarily a question for the decision of the international president, which decision is final until passed upon by the executive council or in convention. (See International Constitution, Article IV, Paragraph 9.)
"I therefore conclude that the controversy herein is one of policy or internal lodge government, rather than one involving property or property rights, and that the court will not interfere unless the acts of the international officers were capricious, arbitrary or illegal. Grand Aerie, Fraternal Orderof Eagles, vs. Nat. Bank of Washington, 13 Wn.2d 131;Constantino v. Moreschi, 9 Wn.2d 638; Snay v. Lovely, (Mass.) 176 N.E. 791.
"In view of such conclusion, it is probably unnecessary for me to decide whether the action of the plaintiff local, by passage of the resolution reducing the salary of its elective officers during their term, was a breach of its contract with its officers, or was, under general civil law, against the public policy of the land. Following my usual practice of passing upon each question raised in a case, I will, however, also rule upon this question.
"Under the evidence in the case at bar, there is present the action of the local lodge in attempting to reduce, during his term of office, the salary of an elective officer or officers without their consent. No cases directly in point upon the question have been cited by counsel herein. I am of the opinion that when an elective officer assumed office, an implied contract or obligation was created between him and his local. He became obligated to faithfully perform his duties during the term of his office, which obligation would be breached if he resigned without the consent of the local. On the other hand, the local, impliedly at least, *Page 562 
agreed to pay him the salary agreed upon during such term. If the local reduced his salary during the term without his consent, it would breach such contract. Such a view is, I believe, supported by the general law of contracts, and, inferentially at least, is supported by the decision of our supreme court in the case ofChatfield v. Seattle, 198 Wn. 179, a case dealing with municipal employees, wherein the court said (p. 186):
"`It is against public policy for an employee of a municipal corporation to agree to waive any part of his salary, as lawfuly fixed. * * *'
"In such cited case, while there was a charter provision against increasing the salary during the term, there was no provision against reducing such salary.
"I can see no reason for limiting the rule of the Chatfield
case to municipal employees. The salaries of the officers of the local herein were lawfully fixed at the time they were inducted into office, and to hold that such salaries could be reduced without their consent at a meeting attended by a small minority of the membership, would, in my opinion, in effect render their tenure in office precarious, and increase, rather than decrease, political activity, dissension and arbitrary action. This is clearly evidenced in the case at bar, where it appears from a preponderance of the evidence that in fact no real necessity nor emergency existed for such reduction of salaries. While it appears from the evidence that the membership of the plaintiff local had decreased, it had at the time here in question approximately 6,000 members and liquid assets of approximately $600,000, including approximately $133,000 in cash and $275,000 in bonds. (See Ex. 1, 47 and 76). At the time here in question, no emergency existed, and there was no provision in either the subordinate lodge constitution or in the local's by-laws authorizing the local to reduce the salaries of its officers during the term of their office. The evidence discloses that all necessary economies could have been effected without so reducing such salaries.
 "(3) Was the Action of the International Officers Arbitrary, Capricious or Illegal?
"It clearly appears from a preponderance of the evidence that the president and officers of the international have been neither arbitrary nor capricious, and that they have at all the times here in question acted in good faith and in accordance with the laws of the order and the land. Indeed, the evidence discloses that they have been exceedingly patient and diligent in their efforts not only to peaceably *Page 563 
settle this controversy, but also to establish harmony between the different factions of the local lodge here in question. Instead of taking hasty or drastic action, they have not only carefully investigated the financial condition of the local, but made recommendations for economies consistent with the laws and policies of the brotherhood. They have given careful consideration to the complaints and suggestions of the various officers and members of the local, and have accorded the factions a fair hearing before the executive council of the brotherhood. The evidence discloses that such officers, at the time of the trial herein, were still continuing their efforts to promote harmony and allay dissension in the plaintiff local.
 "(4) The Plaintiffs have not Exhausted Their Remedies Within the Brotherhood.
"The plaintiffs have not perfected any appeal, within the union, from the decision, directive, order or acts of the international president or the executive council of the brotherhood; nor have they initiated any proceedings under the referendum provided by the international constitution. They, however, contend that the court shall review such acts, decisions, directives or orders, because such appeal would be illusory or vain, in that (a) the national convention will not be held until 1948, and (b) such convention would or might be dominated and controlled by the national officers, who, it is contended, are prejudiced.
"In the leading case dealing with this subject, viz., Snay v.Lovely, 176 N.E. 791, the supreme court of Massachusetts, in overruling contentions similar to those advanced herein, said (p. 793):
"`Another obligation impliedly arising from her membership in the union was that the plaintiff must exhaust remedies open to her within the union before seeking relief in the courts for any wrong done her by the organization, unless it appears that resort to those remedies would be illusory or vain. * * * The constitution of the union plainly provides that the plaintiff might have appealed from the adverse decision of the general executive board to the convention. That convention was the body next above the general executive board and had power to reverse and annul its decisions. Her failure to avail herself of thisremedy for the redress of grievances afforded by the fundamentallaw of the union prevents her asking the interposition of a courtof equity. There is in the record no foundation for a contentionthat such an appeal would have been fruitless, or that it wouldnot have been treated fairly by the convention. *Page 564 
* * * The factor that the convention did not assemble until ayear or more after the suspension of the plaintiff, and then in acity outside of the commonwealth, may be important, in connectionwith others having an overreaching or crafty aspect, indetermining whether a particular contract is so harsh andunreasonable as to be offensive to sound legal principles. * * *But standing alone, it is not enough in the circumstances heredisclosed to be a basis for relief. * * * The single circumstancethat the plaintiff, by reason of her suspension from membership,was unable to secure work in union or closed shops, while nodoubt resulting in damage to her, does not create a cause ofaction in connection with all the other facts here disclosed.'
(Italics mine. [Judge Batchelor's])
"That case has been cited with approval in the following cases:Cohen v. Silver, 178 N.E. 509, 510; Donovan v. Travers,188 N.E. 705, 707; Henry v. Twichell, 189 N.E. 593, 598; Sullivanv. Barrows, 21 N.E.2d 275, 278; Becker v. Calnan,48 N.E.2d 668, 670, 672; Walsche v. Sherlock, 159 A. 661, 664, and in the dissenting opinion of Justice Frankfurter in Elgin v.Burley, 325 U.S. 758, 89 L.Ed. 1913.
"The case of Local Lodge No. 104 v. International Brotherhood,etc., 158 Washington 480, upon which plaintiffs herein rely, is, I believe, inapplicable and uncontrolling in the case at bar, for the following reasons: (1) It is distinguishable on the facts, in that a tangible property right was there involved; (2) the existing international constitution here in question provides that controverted questions, rulings, grievances and appeals may be determined by either the national convention or under referendum by a majority of the subordinate lodges; and (3) that a special convention can be called at any time under such referendum proceedings. As hereinabove noted (see my discussion under `1. Scope or Extent of Inquiry,' etc.) this cited case ofLocal Lodge No. 104 v. Brotherhood, etc., 158 Wn. 480, was distinguished by the supreme court in the later case ofConstantino v. Moreschi, 9 Wn.2d 638.
"It is observed that the above cited case of Walsche v.Sherlock, 159 A. 661, is also distinguishable, upon the facts, from the case at bar. In such cited case, the chancellor found (1) that there was no provision in the lodge constitution for an appeal to the national convention, and (2) that the international president arbitrarily ignored grievances and appeals.
"The evidence in the case at bar discloses no prejudice nor arbitrary action on the part of the president or other *Page 565 
officers of the international. There is no evidence that they have in the past dominated or controlled the national conventions. On the contrary, the evidence discloses that as such officers they have no votes in such conventions. Mere delay in the holding of the national convention is not a valid reason for the interference of the courts in the internal matters of unions or beneficial associations. (Snay v. Lovely, supra; Becker v.Calnan, supra.)
"Justice Frankfurter, in the above-cited case of Elgin etc.Co. v. Burley, 325 U.S. 758, 89 L.Ed. 1886, 1913, said:
"`* * * To ask courts to adjudicate the meaning of the Brotherhood rules and customs without preliminary resort to remedial proceedings within the Brotherhood is to encourage influences of disruption within the union instead of fostering these unions as stabilizing forces. * * * To an increasing extent, courts require dissidents within a union to seek interpretation of the organization's rules and to seek redress for grievances arising out of them before appropriate union tribunals. * * *'
"I therefore find and conclude (1) that the plaintiffs have not exhausted the adequate remedies provided in the international constitution; and (2) that the contention that an appeal to the tribunals provided by such constitution would be illusory or vain, is not well founded either under the evidence or the law.
 "2. Extent of the power of the international president with reference to salaries of officers of subordinate lodges.
"Under the provisions of Article IV of the international constitution, the president is given the direction and supervision of all subordinate lodges, with broad powers to suspend their individual members, officers or lodges, when in his judgment their actions are in violation of the international or subordinate lodge constitutions, or are in violation of the declared policies of the International Brotherhood. In the subordinate lodge constitution, the supervisory authority of the international is recognized, and the local presidents are obligated to see that all instructions from the international president are complied with, and it is further provided that the international secretary-treasurer is recognized as the one from whom authority must be sought for any deviation from normal expenditures. The funds of the locals are declared by the subordinate lodge to be a trust fund.
"Under the broad powers so given the president, he has the power, and it is his duty, in my opinion, to safeguard *Page 566 
this trust fund and exercise supervision over disbursements therefrom. The international has not only a financial interest therein (Grand Aerie, Fraternal Order of Eagles v. Nat. Bank ofWashington, et al., 13 Wn.2d 131, 136) but it has the legal and moral duty of safeguarding said fund, not only for the benefit of the members of such local lodge, but also the other lodges of the brotherhood and their membership. The broad powers of supervision and direction include the power to approve or disapprove disbursements from such fund.
"In the case of Great Northern R. Co. v. Snohomish County,48 Wn. 478, 484, our supreme court said:
"`What is meant by general supervision? Counsel for respondents contend that it means, to confer with, to advise, and that the board acts in an advisory capacity only. We cannot believe that the legislature went through the idle formality of creating a board thus impotent. Defining the term "general supervision" in Vantongeren v. Heffernan, 5 Dak. 180, 38 N.W. 52, the court said:
"`"The secretary of the interior, and, under his direction, the commissioner of the general land office has a general `supervision over all public business relating to the public lands.' What is meant by `supervision?' Webster says supervision means `to oversee for direction; to superintend; to inspect; as to supervise the press for correction.' And, used in its general and accepted meaning, the secretary has the power to oversee all the acts of the local officers for their direction; or as illustrated by Mr. Webster, he has the power to supervise their acts for the purpose of correcting the same; and the same power is exercised by the commissioner under the secretary of the interior. It is clear, then, that a fair construction of the statute gives the secretary of the interior, and, under his direction, the commissioner of the general land office the power to review all the acts of the local officers, and to correct, or direct a correction of, any errors committed by them. Any less power than this would make the `supervision' an idle act, — a mere overlooking without power of correction or suggestion."
"`Defining the like term in State v. Fremont etc. R. Co.,22 Neb. 313, 35 N.W. 118, the court said:
"`"Webster defines the word `supervision' to be `The act of overseeing; inspection; superintendence.' The board therefore, is clothed with the power of overseeing, inspecting and superintending the railways within the state, for the purpose of carrying into effect the provisions of this act, and *Page 567 
they are clothed with the power to prevent unjust discriminations against either persons or places."
"`It seems to us that the term "general supervision" is correctly defined in these cases. Certainly a person or officer who can only advise or suggest to another has no general supervision over him, his acts or his conduct. * * *' See also:Kellyville Coal Co. v. Bruzas, (Ill.) 79 N.E. 309, 311; U.S.v. Dimmick, 112 Fed. 350; N.Y. Life Ins. Co. v. Rhodes, (Ga.)60 S.E. 828.
"To hold that the international officers could not exercise the power of approving or disapproving expenditures of the subordinate lodges would be tantamount to extending a carte blanche invitation for such local lodges to squander their funds. If, as contended by the plaintiffs herein, the local can reduce salaries against the advice, direction or order of the international president, it can also raise such salaries in the same manner, and arbitrarily dissipate the funds without hindrance. And the evidence herein discloses that the plaintiff local, at the meeting at which the defendant Toner was inducted as president, (a then unsalaried officer) voted him a salary of $400 per month, and at a meeting held approximately two weeks later rescinded its action and made him once more an unsalaried officer. The evidence herein discloses that Mr. Toner did not at any time request a salary, and that the action rescinding his salary was taken by the local after he, Toner, had expressed himself in favor of following the directives of the international president and had refused to resign. The evidence discloses that Mr. Toner has at all times acted in good faith and has performed his duties in accordance with his obligation as an officer of the local.
"I therefore conclude that the directive and order to the local here in question was valid and legal, and that in issuing the same the international president acted in good faith and within the powers granted him by the international constitution.
 "3. The affirmative defenses.
"I find that the affirmative defenses of the defendants, other than Joe Clancy, have been clearly established by a preponderance of the evidence. To avoid making a decision, already lengthy, more complex, I shall not detail the evidence. Suffice it to say that the controversy here in question arose during an attempt, on the part of the plaintiffs Nick Hughes and John Grosso, to subvert and evade paragraph 5 of Article III of the subordinate constitution relative to the term of office of elective officers. In an attempt to *Page 568 
persuade or coerce the elective officers to resign so annual elections could be held, said plaintiffs Hughes and Grosso were aided and abetted by the defendant Clancy, Bill Miller and several other members of the local. The business agent, O'Neill, who had defeated Hughes in the preceding local election, refused to comply with or accede to such persuasion or coercion. Hughes and Grosso had prepared, circulated, and caused to be presented to the international president a petition for a special election. Upon being advised that a special election could only be called to fill vacancies caused by death or voluntary resignations, said plaintiffs conceived the plan of coercing O'Neill and other officers of like mind to resign, by reducing their salaries.
"Under the guise of making economies, the trustees, Grosso and MacKenzie, submitted a recommendation for the reduction of salaries. (See Ex. 11). The international president, having in the meantime received complaints, sent an international vice-president to Seattle, who made recommendations to the local lodge, embodying economies other than the reduction of salaries. Included in such recommended economies was one with reference to the local's paper, `104 Reporter,' which the evidence disclosed was under the management and control of the plaintiff Hughes and the defendant Clancy. At the regular meeting held on January 19, 1946, the trustees' report was adopted, and the recommendations of the international vice-president defeated by a majority vote of those who were present at the close of a spirited, if not stormy, meeting. Only a very small percentage of the entire membership of the local was present at the meeting. It is noted that while notice of the meeting was printed in the `104 Reporter,' and printed copies of the trustees' recommendations circulated among the members, no copies of the recommendations of the international vice-president were circulated. The directive or order of the president, here in controversy, followed after a hearing before the international executive council.
"The affirmative defense of the defendant Clancy is not tenable, either in fact or law. The evidence discloses an evasive attempt on his part to subvert the laws and policies of the international and the lawful directives and orders of its international president.
"Because the evidence, in my opinion, shows that the dissension in the plaintiff local lodge has been caused by the acts of a very small minority of the membership, nothing in this opinion should be construed as a criticism or censure *Page 569 
of the membership outside of that minority. In my opinion, the great majority of the members of this local union are loyal and true to their obligation.
"I do not hold that the plaintiff local may not reduce the salaries of its officers or effect economies. On the contrary, I hold that such reductions or economies must be made according to the constitutions, laws and general policies of the brotherhood. I hold that the salaries of elective officers cannot be reduced during their term of office without their consent, and all such reductions or economies are subject to the approval or disapproval of the international officers.
"I do not hold that the plaintiff local is not entitled to the autonomy provided by its international and subordinate constitutions. On the contrary, I hold that the local and its members are entitled to be protected from arbitrary, capricious and subversive acts of a small minority.
"I do not hold that the international officers of the Brotherhood may act arbitrarily or capriciously, but on the contrary do hold that such international officers, throughout this controversy, have acted in good faith, without any capricious or arbitrary action on their part."
I am unable to agree with the contention of the majority that § 236 (c) of Restatement of the Law of Contracts, should be used to ascertain the meaning of the constitution of the parent union. The opinion makes no endeavor or attempt to consider the contract from the standpoint of interpretation under the primary rules as embraced in the Restatement. I quote from Restatement of the Law of Contracts the rules for interpretation as follows:
"§ 230. STANDARD OF INTERPRETATION WHERE THERE IS INTEGRATION.
"The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended to mean. . . .
"§ 234. EFFECT ON STANDARD OF INTERPRETATION WHERE LAW GIVES ESTABLISHED MEANING TO WORDS.
"Where the law gives to certain words an established meaning, this meaning is less readily controlled by the *Page 570 
standard of interpretation otherwise applicable than is the meaning of other words. . . .
"§ 235. RULES AIDING APPLICATION OF STANDARDS OF INTERPRETATION.
"The following rules aid the application of the standards stated in §§ 230, 233.
"(a) The ordinary meaning of language throughout the country is given to words unless circumstances show that a different meaning is applicable.
"(b) Technical terms and words of art are given their technical meaning unless the context or a usage which is applicable indicates a different meaning.
"(c) A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together.
"(d) All circumstances accompanying the transaction may be taken into consideration, subject in case of integrations to the qualifications stated in § 230.
"(e) If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation. . . .
"§ 236. SECONDARY RULES AIDING APPLICATION OF STANDARDS OF INTERPRETATION.
"Where the meaning to be given to an agreement or to acts relating to the formation of an agreement remains uncertain after the application of the standards of interpretation stated in §§ 230, 233, with the aid of the rules stated in § 235, the following rules are applicable:
"(a) An interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention is preferred to an interpretation which leaves a part of such manifestations unreasonable, unlawful or of no effect.
"(b) The principal apparent purpose of the parties is given great weight in determining the meaning to be given to manifestations of intention or to any part thereof.
"(c) Where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions."
The primary rules of construction should have been used in this case, especially that rule of construction which says that a writing is interpreted as a whole, and all writings forming a part of the same transaction are interpreted together. *Page 571 
The rule, as adopted by the majority, is contrary to the rule laid down by this court in several cases.
In construing a contract, it is elemental that the intention of the parties thereto must be gathered from the whole instrument, and each part or portions thereof, if possible, should be construed so that all the parts or portions may have some effect.Hollingsworth v. Robe Lbr. Co., 182 Wn. 74, 45 P.2d 614.
Where there is a conflict between two provisions of a contract, the rule is that effect will be given to that provision which more nearly effectuates the purpose of the entire contract or agreement. Vance v. Ingram, 16 Wn.2d 399, 133 P.2d 938.
The contract must be construed as a whole, and the intention of the parties is to be collected from the entire instrument, and not from detached portions; and no undue stress should be given to any detached portion. Johnston v. Maryland Cas. Co., 22 Wn.2d 305, 155 P.2d 806.
In In re Garrity's Estate, 22 Wn.2d 391, 156 P.2d 217, the rule was announced as follows:
"In ascertaining the intention of parties to a written agreement, we must look to the wording of the instrument itself as made by the parties, view it as a whole, and consider all of the circumstances surrounding the transaction, including the subject matter together with the subsequent acts of the parties to the instrument. Courts will give to words in a contract the ordinary or common meaning. A liberal construction will be given to contracts in order that they may be given effect and to carry out the intention reflected therein. State ex rel. Seattle v.Seattle Elec. Co., 71 Wn. 213, 128 P. 220, 43 L.R.A. (N.S.) 172; Kanaskat Lbr. etc. Co. v. Cascade Timber Co., 80 Wn. 561,142 P. 15; Puget Sound International R. v. Everett,103 Wn. 495, 175 P. 40; Thomle v. Soundview Pulp Co., 181 Wn. 1,42 P.2d 19; Peabody v. Star Sand Co., 186 Wn. 91,56 P.2d 1018; Bellingham etc. v. Bellingham Coal Mines, 13 Wn.2d 370, 125 P.2d 668."
If the primary rule of interpretation as set out in the Restatement, and as heretofore announced by this court, were used to determine the meaning of the provisions of the International constitution, and the by-laws of appellant *Page 572 
lodge, but one conclusion could be reached, and that would be — the parent body is the governing body and entitled to exercise control over the local lodge to the end that the International, and all of its six hundred locals, may work for a common purpose.
Anyone familiar with the history, organization, purpose, and practice of labor unions, as gleaned from general knowledge and the evidence in this case, cannot but realize that supervision as lodged in international bodies applies directly to the activities of local or subordinate unions. The International president and the union's executive council were in a position to apply the proper standards of interpretation of the constitution. That interpretation should, in the absence of arbitrary and capricious action, now be followed by the courts as in days gone by.
Another reason for holding that the appellant lodge should not prevail in this case is that it, represented by its officers and four elected members, appeared before the executive council and submitted to that council the question presented in this case. This incident was not mentioned in the majority opinion. Having submitted to the jurisdiction of the executive council of the parent union, they should not now be heard to say, after they have lost their case before the union officials, that the constitution does not give them proper recourse.
The International Brotherhood in question, as is true of all labor unions embodied within the American Federation of Labor, vests the executive and judicial power of the International Brotherhood, when the convention of the Brotherhood is not in session, in its executive council and its International president. It makes the determination and declaration of the law by the president final, and, until the majority opinion was handed down, such determinations of law of voluntary associations were respected and enforced by the courts unless the law itself, as so declared, fell into one of three classifications — first, found no authority, foundation, or basis in the law of the brotherhood; second, violated the law of the land; third, was the result of a decision rendered in bad faith — that is arbitrary or capricious. *Page 573 
The statement of the issues involved, as made in the majority opinion, ignores the fact that the case came to the International upon the appeal of aggrieved officers, adversely affected. It further ignores the fact that the reduction of salaries was not necessary because of the condition of the local treasury. The opinion further ignores the fact that the reduction of salaries was made at the time when the Brotherhood generally was seeking a raise in wages for all of its members, and that the reduction is contrary to the established policies of the Brotherhood, and, in fact, contrary to the specific purpose for which labor unions are organized — that is, to secure the best possible wages, hours, and working conditions.
The majority opinion seems to hold that the time for an appeal to the convention was too far advanced to give the appellants any relief. I cannot see how that holding is material in view of the fact that the national organization in its convention — and appellant was represented there — amended its constitution to provide for four-year terms. The opinion must necessarily be construed to mean that a labor union cannot establish a four-year term for its national and subordinate lodge officers. The majority opinion says that "the weight of authority appears to be. . . to the general effect that, where the controversy is financial in nature, rather than wholly disciplinary, the courts make an exception to the general rule that they will not adjudicate the question presented." I find no such holding in any of the cases cited in the opinion, nor can I find authority anywhere else that will uphold the statement made by the majority.
If the opinion in this case is followed, there can be no case in which the parent union may supervise the actions of the local union, no matter what their constitution may provide. This is clearly apparent from the following statement in the opinion:
"If a court has no jurisdiction of an action, the parties cannot by stipulation confer it upon the court. Adams v. WallaWalla, 196 Wn. 268, 82 P.2d 584.
"Likewise, if the court has jurisdiction, the parties cannot by contract deprive the court of it." *Page 574 
The law relating to arbitration destroys the last-quoted statement.
The majority opinion is unprecedented, and revolutionary in character, and, if adhered to, will have the effect of destroying every labor union in the United States. Each local union will be a law unto itself. They will compete with each other. They will not have the benefit of the national organization to assist them in the work to which labor unions are dedicated. Only by united effort can the labor unions exist. Divided they will fall. Why destroy an organization which has brought so much good to the world by raising the American workman from a condition of serfdom into a position where he can enjoy the fruits of his labor?
The judgment of the trial court, founded as it was upon sufficient facts, and the law, as announced by all courts prior to the handing down of the majority opinion, was correct, and should be affirmed.
MILLARD, J., concurs with SIMPSON, J.
MALLERY, C.J.
What is "revolutionary" or destructive about affording to unions and union members their constitutional right to due process of law? *Page 575